I have not examined the evidence critically, in order to see whether the jury, under proper instructions, might have found that Peck, the teller of the defendants, was authorized to certify checks when the drawers had no funds on deposit. Such an authority, no doubt, might be implied from a general usage, if that had been proved, or from a practice of the kind in this particular bank, known to the directors. But as the law was stated to the jury, no such question arose for their consideration. They were instructed that there was "no doubt of the authority of Peck, the teller, to certify checks in the manner those in question were certified, so as to bind the defendants to pay them to those who took them bona fide in the usual course of business, and for value." They were further instructed that if the plaintiffs had previously held similar checks, certified in the same manner as those were, which had been uniformly paid by the defendants on presentation, without objection, then the plaintiffs were entitled to recover, provided they took the checks in question in good faith, for value, and without notice that the teller had no authority to certify them. The checks previously held by the plaintiffs represented actual deposits of money, and they were, therefore, certified by due authority. The defendants, of course, paid them without objection, as they could have no possible objection to make. The checks in question were false and fraudulent pretences, representing no funds of the drawer. The charge assumed the absence of all authority to certify them, but held the defendants liable on the ground that the plaintiffs received them for value, and without notice of the defect of power. It was also assumed, on the trial, that when the checks in question *Page 144 
were presented for payment, about a year after they were certified, there were no funds to meet them.
The Supreme Court, whose judgment we are reviewing, regarded these certificates of the teller as acceptances payable on demand; and for that reason the delay in presentation was considered no objection to a recovery against the bank as the acceptor. In my judgment, the court was clearly right in this construction, and right also in the consequence drawn from it, that the certificates, as acceptances, if duly authorized, were obligatory, as in any other case, until paid, or the statute of limitations should attach as a bar. The question I now propose to examine is, whether the teller had power to enter into these contracts as the agent of the defendants.
In the first and most obvious view of an agency of any description, the principal is bound by such acts as he has authorized, and no others. In a just sense, this is universally and necessarily true, because the proposition is involved in the very idea of agency. If there are apparent exceptions in the books, they are not such in fact, but are merely varieties in the application of the rule, which do not contradict the rule itself. This will appear when we consider the modes in which powers are derived from a principal to an agent so as to bind the former in favor of third parties. An agency may be constituted by writing. When this is the case, the agent takes precisely such authority as the instrument confers, upon a fair construction of the language used, taken in connection with the general or particular purpose of the power. An authority thus derived of course includes, in the absence of special restrictions, all such incidental powers and means as are necessary in the execution of the main purpose. The agency may also be created by a special verbal appointment. I use the word special, not with reference to the powers to be exercised, but to the mode of creating them by special or express words. When the language of such an appointment is once ascertained, it is *Page 145 
perfectly obvious that the authority of the agent is precisely what it would be if it were conferred by a writing in the same language.
But there is another, and, for all purposes connected with the present inquiry, only one other mode of delegating power. Without any express or special appointment, an implied agency may arise from the conduct of a party. (Story on Agency, § 54.) Where a person has recognized a course of dealing for him by another, or a series of acts of a particular kind, an implied agency is thereby constituted to carry on the same dealing or to do acts of the same character. Now, the only difference between such an agency and those which are created by express appointment, whether verbal or in writing, is, that the latter may, by the very terms of the power, be confined to a single transaction or act, while the very existence of the former is derived from a course of recognized dealing or a series of recognized acts. This implied agency is therefore never a special one, in the sense in which that term has generally been used. All express agencies may or may not be special, according as they authorize, or do not, more than a single act. Although much has been said concerning general and special agencies, there never was any other intelligible distinction indicated by those terms. Where this distinction does not exist, in other words, where the power is not special in this sense, agencies by express appointment and those implied from conduct are entirely similar in all their characteristics and incidents. In the one class, the authority is manifested by an express delegation; in the other, it is presumed or implied from the conduct of the principal. This presumption is allowed even against the real facts of the case, where the rights of bona fide dealers are concerned. In all this class, it is presumed that the principal has actually delegated power to do the acts which he has been in the habit of recognizing and approving. The power thus presumed is to be judged in all respects as though the *Page 146 
delegation were actually shown. It will justify and uphold acts of the same kind, or, in other words, within the presumed authority, but no others.
I have observed that there may be seeming contradictions of the fundamental doctrine, that a principal is bound only by such acts of his agent as he has duly authorized. This presumptive or implied agency is one of these, because a man may have accepted and approved acts which he never authorized, and so be bound, as to third persons, by similar acts. Another and the only other of these apparent contradictions is, where the acts done by the agent are justified, as to innocent dealers, by the authority, whether conferred by express delegation or presumed in the manner indicated, but are opposed to special private restrictions. In such cases the liability of the principal rests upon a just distinction between the power conferred and private instructions as to its exercise. But the power must in all cases be vested either actually or presumptively, and if it be not, the principal cannot be charged.
The principles, so far stated, are simple and elementary, although they have been somewhat obscured by loose and indeterminate expressions in the books. Applying them to the present inquiry, it becomes plainly of no importance whether the power of Mr. Peck, the defendants' teller, to certify checks, was derived from a special appointment or from a recognition of his acts. At the circuit it appears to have been placed on the ground of recognition, and no special appointment was shown. The difference is merely in the mode of constituting the agency. The power in either case is the same. Viewing it as derived or implied from acts recognized and approved, the inquiry at the circuit should have been, what were those acts? If they were confined to the certification of checks drawn upon actual deposits, then the power to be implied or presumed was to do acts of the same character, but not of a character wholly different, although clothed in the same form. In a *Page 147 
word, the certifying authority of the teller is to be construed and treated in all respects as though it had been given to him by a written instrument specially defining and restricting it; and viewing the authority in this manner, we are to inquire whether, under a power expressly confined to the certification of checks drawn upon sufficient funds on deposit with the defendants, the teller could bind them by certificates which were fictitious and false. These certificates, as we have seen, are to be regarded as acceptances; and another mode of stating the inquiry therefore is, could the teller, with authority only to accept checks drawn upon actual funds, bind his principals, by accepting for the accommodation of the drawer, when there were no funds on deposit and none in expectancy?
This question, it is proper now to observe, cannot be determined in the plaintiffs' favor on the ground that the limitations upon the agent's power were in the nature of private instructions merely, in regard to its exercise. The difficulty which meets us in this view of the case is, that the power exercised is not embraced at all in the commission. An authority to accept drafts, in the regular business of the principal, upon funds of the drawer, is a precise and well defined authority. It cannot, in my opinion, include acceptances out of the principal's business, and for the accommodation of third persons. So, an authority to accept or certify checks, in the regular course of banking business, would seem to be equally definite. It does not embrace a power to pledge the responsibility of the bank for the accommodation of persons who are not depositors and have no funds. It is urged that the teller is a proper agent or officer to answer questions and give information as to the funds of a person who draws his check. But this is a very different thing from entering into a written engagement which operates to transfer the fund, if there be any, from the depositor, and which, whether there be any funds or not, imposes a pecuniary obligation on the bank, to last until barred by *Page 148 
the general statute of limitations. It ought not to be contended seriously that such a power can be derived from the simple practice in a bank of turning to its books and communicating to inquirers, through the teller or book-keeper, the condition of its customers' accounts. There is still another answer to the suggestion. Although such is the practice, it is not one of the legal duties or obligations of a bank to furnish this kind of information to inquiring people, nor does it enter into any engagement with the public to discharge such a function. If this be so, then plainly a bank cannot be made liable because one of its agents, either at the counter or in the street, makes a false and fraudulent statement concerning a matter about which the bank, as such, is bound to furnish no information at all. And this is a further illustration of the soundness of the position already taken, that a bank is bound to pay a certified check only in the character of acceptor. I admit it may accept checks with or without funds, and be bound by that contract; but the obligation to pay them rests, as in any other case, upon the acceptance, and it is not at all derived from any supposed duty or custom of communicating to an individual the condition of another's account.
Nor can the question before us be solved upon any distinction between a general and a special agency. I believe there is such a distinction, valuable in some cases, but in most of no value whatever. The one I have already suggested is the one generally approved. "A special agency," says Judge STORY, "properly exists where there is a delegation of authority to do a single act; a general agency properly exists where there is a delegation to do all acts connected with a particular trade, business or employment." (Story on Agency, § 17.) Now, the only difference in doctrine arising out of this distinction is, that all the restrictions upon the authority of the special agent take effect, while, in the case of a general agent, all acts embraced in the delegation are valid, as to third parties, although directly *Page 149 
opposed to private instructions. It still remains true, however, that the acts done must in all cases be within the power, in order to bind the principal. We may, therefore, call the agency of the defendants' teller a general one, according to this distinction, and still the question will return, what were his powers? A general authority to do an indefinite number of acts of a particular kind by no means constitutes a universal agency. The acts specified in the commission can be justified and upheld, but no others.
It is said that a principal is bound by all acts done within the ostensible or apparent scope of the power; and this is true. But what are the ostensible or apparent powers of an agent? The answer is, they are such as are conferred by the express appointment, or implied from recognition and the conduct of the principal; in the latter case, as we have seen the implication being that the acts were authorized which the principal has recognized and approved. In either case the authority is ostensibly and apparently given, although there are private restrictions upon its exercise. These, bona fide dealers are not bound to know. But they are bound to know what the delegation is. If this is to be presumed from acts which have been recognized, then they are bound to know the character of those acts. That being ascertained, the power is brought to their inspection as much as though it were in writing and placed before them. The doctrine of ostensible agency goes no farther than this.
The aphorism sometimes laid down in reference to agency, that "where one of the innocent parties must suffer, he who has employed the agent and enabled him to commit a fraud should be a loser, rather than a stranger," does not aid in solving the present question. It was first applied by Lord HOLT, in Hern v.Nichols (1 Salk., 289). In that case the defendant's factor, being authorized to sell silk, defrauded the vendee by misrepresenting the article. The principal was held liable; "for," said the lord chief justice, "seeing somebody must be a loser by this deceit, it is more reasonable *Page 150 
that he who employs and puts a confidence in the deceiver should be a loser, than a stranger." If an agent, in dealing for his principal strictly within the authority, commits a fraud, the principal must answer for it. He cannot adopt the dealing and repudiate the fraud. There is no doubt that he can repudiate the entire act in such a case by restoring the dealer to his former situation. The maxim, therefore, as applied by Lord HOLT, is well enough. But there is a possible construction of his language which would lead to the most absurd results. It would certainly be absurd to hold that a principal is responsible for the general honesty of his agent, and is, therefore, liable for acts attended with fraud, which, although done in his name, are not included within the power.
It should now be observed further, that an agent may clothe his unauthorized acts in the same form as those which are authorized, and still the principal will not be liable. To charge the principal, the acts must be of the same character, not merely in appearance, but in their substance and nature. Thus, an authorized acceptance by an agent upon funds of the drawer is the same in appearance as an unauthorized one for the accommodation of a stranger. In the latter case the false appearance is derived wholly from the false representation of the agent. But as the principal has not authorized the act, so he has not the representation. I admit it is enough if the authority apparently includes the transaction, but that must be taken to mean the transaction as it is, and not its counterfeited appearance. The true rule of agency I take to be, that the principal is liable for such acts as he has authorized, and not for all their possible counterfeits. This is a distinction which I had occasion to notice at some length in the case of The Mechanics' Bank v.The New Haven Railroad Company (3 Kern., 599), and I have nothing further to add to the remarks I then made. *Page 151 
If the question before us were a doubtful one upon principle, I should still find it difficult to disregard the authorities which seem to me to control it. In England, the rule appears to be settled in accordance with the views which have been stated. InGrant v. Norway (10 Com. Bench, 665), the master of a vessel in the East Indies signed a bill of lading in the usual form, declaring that twelve bales of silk were shipped on board to be delivered in London to order or assigns. The shippers indorsed the bill of lading, and pledged it for a valuable consideration to the plaintiff. The goods were never, in fact, shipped, and the plaintiffs brought an action on the case against the defendants, who were the owners of the vessel, for the injury they had sustained in giving credit to the bill. It was admitted, as the law certainly is, that the master is the general agent of the owners, with full authority to sign bills of lading. It was nevertheless held, after very elaborate argument, that the plaintiff could not recover, and the decision was placed very explicitly on the ground that the master had no authority to sign bills of lading for goods not shipped. The master, it was said, by general usage had authority to sign bills for goods shipped, but not otherwise; and this usage was deemed notice to all the world that the authority was so limited. It was thereupon held (quoting the language of Chief Justice JERVIS), that "a party taking a bill of lading, either originally or by indorsement, for goods never put on board, was bound to show some particular authority given to the master to sign it." Now, in that case, the bill of lading covered a fictitious shipment of goods. In the present, the agent certified checks to be good which were drawn upon fictitious deposits. In both of the transactions the agents' acts were counterfeited so as to resemble exactly those which they were authorized to perform.
In Coleman v. Riches (29 Eng. L. and Eq. R., 323), the plaintiff was a dealer in grain, and the defendant kept a wharf. It was the custom for the vendors of the grain to *Page 152 
deliver it at the wharf and take a receipt from the defendant's servant. On production of this receipt the plaintiff paid the price. For the purpose of getting money from the plaintiff by fraud, the defendant's servant gave to one of the farmers a false receipt, no grain being, in fact, delivered, and the plaintiff paid the price on the receipt being brought to him by the farmer. It was held, upon the want of authority in the agent to give a receipt when no corn was delivered, that the defendant was not liable for the fraud. This case followed and approved that ofGrant v. Norway, and was determined by the same court, the English Common Pleas. The doctrine on which they both proceeded received also the sanction of the Court of Exchequer, inHubbersty v. Ward (8 Exchequer, 330; 18 Eng. L. and Eq.R., 551).
In reference to these cases a suggestion has been made, that the actions being on the case for fraud, the plaintiffs failed because they were not in privity with the defendant in each, whose agent perpetrated the wrong. In Grant v. Norway, a casual remark of one of the judges, while the argument was proceeding, affords some slight countenance to this idea. But when, after the argument, the chief justice came to deliver the judgment of the court, that ground of decision was not so much as alluded to. So in Coleman v. Riches, four of the judges delivered their opinions seriatim, and all of them went on the ground of a want of authority, and none of them on the ground of a want of privity in the dealing. The remark of Chief Justice JERVIS, that there was no evidence that Riches agreed to furnish Coleman with vouchers for corn delivered, was intended by him as one of the arguments showing the want of authority; for he adds as follows: "It was only the case of a wharfinger whose duty it was, on delivery of goods, to give a receipt note. That consideration," he continues, "really disposes of the case, because the agent had authority, on the evidence, only to givereceipts for goods which were, in fact delivered" *Page 153 
To show that I am not mistaken as to the ground of decision in either of the cases, I may also refer to the head notes in the reports. Both the reporters were wrong if I am.
It is, I believe, admitted that the present case cannot be distinguished in principle from The North River Bank v.Aymar, decided by the Supreme Court of this state (3 Hill,
266), and afterwards in the Court of Errors. There the agent was authorized by a written power of attorney, amongst other things, to sign and indorse notes and to accept and indorse bills of exchange in the name of the principal. The action was on eleven notes, six of which were signed and five indorsed in the principal's name, by the agent, and in form in all respects according to the power. It was shown on the trial, as to nine of the eleven notes, that they were not signed or indorsed in the business of the principal nor for his use, but for the accommodation of third parties. The plaintiffs' bank had discounted the notes in good faith, and believing they had been given and indorsed in the business of the principal. It was held in the Superior Court of the city of New-York, where the suit was brought and tried, that the plaintiffs were affected by the excess of power, and could not recover on the nine notes. Error was brought into the Supreme Court, where the judgment was reversed upon the opposite doctrine. The opinion for reversal was delivered by Justice COWEN, in which BRONSON, J., concurred. A dissenting opinion was delivered by Chief Justice NELSON. All were agreed that the power of the agent was confined to notes and bills signed, accepted and indorsed in the business of the principal, although not so expressed, in terms, in the letter of attorney; and all were therefore agreed that the power was in fact exceeded, but not in such a sense as to affect the plaintiffs, who were bona fide holders. The distinction made in their favor, it is well to observe, did not rest at all upon the negotiability of the paper, but upon the familiar principle already stated, that *Page 154 
third parties dealing bona fide with an agent, who acts within the apparent scope of his power, are not affected by special restrictions, of which they had no notice. It was simply a misapplication of that doctrine to a case not within it; because the power, in its real or apparent scope, did not include the acts done. The apparent power was on the face of the letter of attorney, which the bank had in its possession. The agent's acts were counterfeited, so as to appear by his own representation to be within the power, but the power did not include, or appear to include, the actual transaction; and that was the precise error in the decision. The judgment of the Supreme Court was removed, by writ of error, into the late Court for the Correction of Errors, and was there reversed. The case is not reported in that court, for the reason, as the reporter informs me, that the prevailing opinion was not handed to him at the time by the senator who delivered it, and was afterwards lost or mislaid. I have examined, however, the record, and learn from the reporter and one of the judges whose vote was for affirmance, that the reversal was distinctly upon the question discussed in the Supreme Court. It was held that the plaintiffs, although bonafide holders, could not recover on the nine notes, for want of authority in the agent to sign and indorse them. It was a decision of the highest court in this state, and I hold that we are bound by it. We have never refused to follow a clear and distinct determination of that tribunal.
In the case of The Mechanics' Bank v. The New Haven RailroadCompany, a question, which I think identical in principle with the present one, received the careful consideration of this court. In that case the transfer agent of the defendants' corporation was authorized to sign and issue certificates of stock, on a transfer from one shareholder to another upon the books, and on the surrender of the previous certificates. The agent, for his own purposes, signed and issued certificates to a large amount, when there had been *Page 155 
no such transfer or surrender. These unauthorized and spurious instruments were in form precisely like those that were genuine and authorized. Trusting to this false appearance, the plaintiffs took one of them by transfer, and advanced money upon it, which they recovered in the New-York Superior Court. We held they could not recover, and reversed the judgment; placing our decision prominently on the ground that the acts of the agent, in signing and issuing the spurious instruments, were not within the real or apparent scope of the power delegated to him. We certainly did not put our judgment upon the ground that the plaintiffs were not in privity of dealing with the defendants, by reason of the non-negotiable character of the certificates, and therefore could not sue for the fraud. It had been argued that they were negotiable or quasi negotiable. We held they were not; but we further held that, whatever might be their character in that respect, they were void everywhere, because issued without authority. The doctrine asserted was, that whoever deals with a security made by an agent, not less than he who deals directly with the agent, is bound to know the extent and the limit of the authority. This is a plain doctrine. There is no more reason for saying that a principal is bound by an unauthorized bill or note in the hands of a bona fide holder, than for saying he must pay one to which his name is forged, because the holder has paid value, and does not know of the forgery. The only doubt relates to the extent of the power, when construed with reference to dealers who are not cognizant of special restrictions. Negotiability is not of the least importance. Good faith is the only important fact, where it is claimed that the power, in its general scope, includes the transaction, although there may be private restraints upon its exercise. Does an authority to sign a bill of lading, a certificate of stock, a bill, a note or acceptance, when certain conditions arise, as when goods are shipped, when stock is transferred, when the drawer *Page 156 
has funds to meet the acceptance, when the bill or note is required in the regular business of the principal, justify the doing of these acts universally, without any regard to the conditions, and for the accommodation of mankind at large? This is the true point of the inquiry when there is good faith in the dealer; and upon this inquiry all the authorities cited are direct and unanswerable adjudications.
The doctrine of the cases cited has received the sanction of the Supreme Court of the United States, in a case which has very recently appeared. I refer to The Schooner Freeman et al. v.Buckingham et al. (18 How., 182). In that case the libellants were the consignees named in two bills of lading, signed by the master of the schooner, declaring in the usual form that certain quantities of flour had been shipped on board to be sent forward to them. In fact, the flour had not been shipped, and the bills were fraudulent contrivances of the supposed shipper for the purpose of obtaining advances from the consignees, who did advance accordingly, and afterwards libeled the vessel for non-delivery of the goods. They failed on the sole ground that the owner of the schooner was not bound by the contract of the master, the goods never having been shipped. The remarks of Mr. Justice CURTIS are so much to my purpose that I quote: "Nor," said he, "can the general owner be estopped from showing the real character of the transaction by the fact that the libellants advanced money on the faith of the bills of lading; because this change in the libellant's condition was not induced by the act of the claimant (the principal), or of any one acting within the scope of an authority which the claimant (the principal) had conferred. A willful fraud, committed by the master on a third person, by signing false bills of lading, would not be within his agency. If the signer of a bill of lading was not the master of the vessel, no one would suppose the vessel bound; and the reason is, because the bill is signed by one not in privity with the owner. But the same reason applies to a signature *Page 157 
made by a master out of the course of his employment. The taker assumes the risk, not only of the genuineness of the signature and of the fact that the signer was master of the vessel, but, also, of the apparent authority of the master to issue the bill of lading. We say the apparent authority, because any secret instructions by the owner, inconsistent with the authority with which the master appears to be clothed, would not affect third persons. But the master has no more apparent unlimited authority to sign bills of lading than he has to sign bills of sale of the ship. He has an apparent authority, if the ship be a general one, to sign bills of lading for cargo actually shipped, and he has also authority to sign a bill of sale of the ship, when, in case of disaster, his power of sale arises. But the authority in each case arises out of and depends upon a particular state of facts. It is not an unlimited authority in the one case more than in the other, and his act in either case does not bind the owner, even in favor of an innocent purchaser, if the facts upon which his power depended did not exist; and it is incumbent upon those who are about to change their condition, upon the faith of his authority, to ascertain the existence of all the facts upon which his authority depends."
These remarks apply with great precision to the case under consideration. It was in the usual course of the teller's employment to certify checks for actual deposits of money, as it is in the usual course of the employment of a master to sign bills of lading for goods actually shipped. In both examples, and for precisely the same reasons, the course of employment measures the apparent authority, and, therefore, the whole certifying and signing power of the agent. Simulated and fraudulent instruments may be concocted by the agent, well calculated to deceive. But these are the frauds of the individual who concocts them, for which he alone is liable. It is better, I think, in principle, that the rule should be thus, than to adopt another which *Page 158 
would place every person who acts by agents in the power of the latter, and would especially expose to ruin banking corporations, which can act by agents only.
It should not escape observation also that the case of TheSchooner Freeman meets directly the suggestion already noticed, that the English cases of Grant v. Norway, and Coleman v.Riches, and the case here of The New Haven Railroad Company,
can be distinguished from the present by the supposed want of privity between the defrauded recipient of the false instrument and the principal. I say the case of the Freeman meets that suggestion, because the defrauded libellant was the consignee and not the assignee of the bill of lading. By the instrument itself, therefore, he stood in privity with the owner of the vessel, provided it had been signed by the master, acting under due authority. It may be added that the English cases were referred to as authorities, and were understood precisely as I have stated them.
The judgment should be reversed and a new trial granted.
All the judges, except COMSTOCK, J., concurring,
Judgment affirmed.