THE SCHOONER FREEMAN, HER TACKLE, &c., CHARLES HICKOX, CLAIMANT AND APPELLANT, *v.* ALVAH BUCKINGHAM, PHILO BUCKINGHAM, BENJAMIN H. BUCKINGHAM, AND JAMES W. McCULLOK, LIBELLANTS.

Under the admiralty law of the United States, contracts of affreightment, entered into with the master in good faith, and within the scope of his apparent authority as master, bind the vessel to the merchandise for the performance of such contracts, wholly irrespective of the ownership of the vessel, and whether the master be the agent of the general or the special owner.

If the general owner has allowed a third person to have the entire control, management, and employment of the vessel, and thus become owner *pro hac vice*, the general owner must be deemed to consent that the special owner or his master may create liens binding on the interest of the general owner in the vessel, as security for the performance of such contracts of affreightment.

But no such implication arises in reference to bills of lading for property not shipped, designed to be instruments of fraud ; and they create no lien on the interest of the general owner, although the special owner was the perpetrator of the fraud.

Though in such a case the special owner would. be estopped, in favor of a *bonâ fide* holder of the bill of lading, from proving that no property was shipped, yet the general owner is not estopped.

THIS was an appeal from the circuit court of the United States for the northern district of New York.

The case is stated in the opinion of the court.

It was argued by *Mr. Haven,* for the appellant, and *Mr. Ganson,* for the appellee.

*Mr. Haven* made the following points:—

1. Hickox, the claimant, was the owner of the schooner Freeman. He agreed to sell her to John Holmes for $4,500, payable in five instalments, at various times from June, 1851, to December, 1853. And on such payments being made, and other conditions complied with, he agreed to give John Holmes a good and sufficient bill of sale of her, &c. By this agreement, the property of the claimant in the schooner was not devested. Hilliard on Sales, title " Conditional Sales," pp. 18–23 ; Barrett *v.* Pritchard, 2 Pick. 512 ; Ayer *v.* Bartlett, 9 Pick. 156 ; West *v.* Bolton, 4 Verm. Rep. 558 ; Herring *v.* Willard, 2 Sandf. Sup. Ct. Rep. 418.

*Mem.*—Kent, in his Commentaries, (vol. ii. p. 497,) says : " When there is a condition precedent attached to a contract of sale and delivery, the property does not vest in the vendee on delivery, until the performance of the condition, or the seller waives it ; and the right continues in the vendor, even against the creditors of the vendee."

He cites Strong *v.* Taylor, 2 Hill, 326, which is in point, and was decided by Justice Nelson.

2. (Second point omitted.)

3. If Hickox, the owner, had directed the master to sign the bills of lading, or given him authority to do so, without having the flour on board, the schooner would have been bound, or the owner would have been estopped from denying the shipment had been made ; but in a case where there is no fraud, and the master has only general authority as such, he cannot sign a bill of lading for goods not delivered so as to charge the owner or vessel, even when the bill of lading has been assigned or indorsed for value. Grant and others *v.* Norway and others, 70 Eng. Com. Law Rep. 664, fully in point.

4. The signatures of Ramsdell, the master, to the bills of lading, were procured by S. Holmes by fraud, by false representations, and by substitution of false papers, amounting to a fel-

ony, or were forged. And as between Holmes and Hickox, the bills were void and of no validity. This being so, the libellants, if they had been indorsees of the bills for value, would take nothing under them, as they make title to the pretended flour only by showing Holmes shipped it; and bills of lading procured by a felony, by fraud, or forgery, are no evidence of that fact, nor do they estop any one. And this case must stand as though S. Holmes forged the bills. King v. Richards, 6 Whart. Penn. Rep. 418; Berkley v. Wattling, &c., 7 Ad. & El. 29, and 34 Eng. Com. Law Rep. 22; Bates v. Todd, 1 Moody & Robinson, 106; Angell on Carriers, §§ 231–337; Abbott on Shipping, 324, 325, original paging; Bates v. Stanton, 1 Duer Sup. Ct. Rep. 79, and cases cited.

5. But the pretended flour was consigned to the libellants as factors of S. Holmes & Co., and not as owners. By the bills, they were not interested in it; the consignment was " for account of S. Holmes & Co." This would have given the libellants no right or title to the flour had it been on board the schooner, and Holmes could have sold it or given a good title to a stranger at any time before it actually reached the libellants. Patten v. Thompson, 5 Maule & Selw. 350; Russell on Factors and Brokers, 202, 203, republished in Law Library, vol. 48; Grove v. Brien, 8 How. 429, 438; Conrad v. Atlantic Ins. Co. 1 Pet. 345, 386; Kinloch v. Craig, 3 Term Rep. 119.

*Mr. Ganson* made the following points :—

1. The appellees were the consignees of the property, acknowledged in the contracts of affreightment to have been shipped on the schooner, and, as such, had advanced money upon the faith of the shipment therein declared, and the contract therein contained.

2. By such consignment and advance, the appellees acquired a property in the flour mentioned and referred to in those contracts. The delivery of the bills of lading to the appellees, by which the flour was to be delivered to them, and the advancement of money upon the faith thereof, was equivalent to an actual delivery of the property to them, as a security for the advance. Gibson v. Stevens, 8 How. 384; Conard v. Atlantic Insurance Co. 1 Pet. 445; Bank of Rochester v. Jones, 4 Comstock, 497.

3. It is a well-established rule of the maritime law of this country, that the ship is bound to the merchandise, and the well-established practice of our admiralty courts to entertain proceedings *in rem* for the non-performance of contracts of affreightment. The Rebecca, Ware's Rep. 188; New Jersey Steam Navigation Co. v. Merchants' Bank, 6 How. 344; The Volunteer, 1 Sumn. R. 551.

4. If the two contracts in question were made under such circumstances as to bind the vessel, it must answer for their nonperformance. The question then arises, were they so made?

5. Had the master of The Freeman any authority to sign these bills of lading? He was acting under the employment of Sylvanus Holmes. The vessel was in the possession of Holmes. He was running her at his own expense and risk, and for his own benefit. The appellant had not any interest in her earnings, and was not liable for her debts. Sylvanus Holmes, therefore, and not the appellant, was the owner of the vessel, within the signification of that term as used by the maritime law, with reference to determining who is responsible personally for the master's contracts. Reynolds *v.* Toppan, 15 Mass. 370; Hallet *v.* Columbian Insurance Co. 8 John. 272; The Phebe, Ware's R. 263; Cutler *v.* Windsor, 6 Pick. 335.

A person in possession of a vessel, under a conditional contract of purchase, is the owner within the rule referred to. Leonard *v.* Huntington, 15 John. 298; Hinton *v.* Hogeboon, 7 John. 308; Thorn *v.* Hicks, 7 Cowen, 797.

It is upon this rule that the courts hold that a mortgagee out of possession is not liable for supplies; but, if in possession, is liable. McIntyre *v.* Scott, 8 John. 159; Phillips *v.* Ledley, 1 W. C. C. R. 226; Miln *v.* Spinola, 4 Hill, 177; Champlin *v.* Butler, 18 John. 169.

Hence, also, a person running a vessel under a charter-party, is liable for its debts, and the general owner is not; and the vessel is liable for the contracts of the charterer's master. Drinkwater *v.* The Brig Spartan, Ware's R. 149; The Phebe, Ib. 263.

If, under the contract for a conditional sale, there be a forfeiture, and the property reverts, and in case of a charter-party, at its expiration, the vessel goes back to the general owner, subject to the admiralty liens created in the hands of the conditional vendee or charterer.

6. The appellant was a mere mortgagee out of possession, holding, as a mortgagee does, the legal title as a security for the payment of the purchase-money; he, therefore, is not personally responsible for the master's contracts, nor is the vessel liable for the appellant's contracts.

7. The master, therefore, was not the agent of the appellant, but derived all his authority over the vessel, and to make contracts binding upon her, from his employer, Sylvanus Holmes. The master derived his authority from Sylvanus Holmes, in his character as owner, within the signification of that term as used by the maritime law.

8. The contracts of affreightment are such as bind the vessel to answer *in specie* for their non-performance. If they were

16 *

made by the master under such circumstances as to render the person who was *pro. tempore* the owner personally responsible for their performance, then it follows the vessel is liable also; for the liability of each proceeds upon the basis that the contracts are made by one having authority to make them as the agent of the owner of the vessel. The Druid, 1 W. Rob. 399.

9. Sylvanus Holmes would be liable personally upon the contracts, and the master had authority to make them; for they were executed by the procurement of, and used by the owner of the vessel, Sylvanus Holmes, himself.

10. The owner, Sylvanus Holmes, is, therefore, estopped from denying the master's authority to execute the contracts of affreightment; and if the master did execute them with the sanction of the owner of the vessel, his authority to do so cannot be questioned.

11. The master and the owner, Sylvanus Holmes, as against these appellees, cannot deny even the receipt of the property on board, for it would be bad faith in them to do so; much less can they deny the contract to carry the flour, upon the faith of which contract, as well as upon the shipment and receipts declared in the bills of lading, the appellees parted with their money. Niles *v.* Culver, 8 Barb. S. C. R. 205; Abbot on Shipping, 323, (margin;) Foster *v.* Newland, 21 Wend. 94.

12. The appellant cannot impeach these contracts as between him and the appellees,—

I. Because he was not the owner of the schooner, at the time the contracts were made and broken, in the eye of the maritime law. That law only recognizes the person who employed the vessel, and was *pro hac vice* the owner, to determine the liability of the vessel; and if the contracts presented hold good as against such owner, then the vessel is held to be bound to answer, *in specie,* for the non-performance of the contracts, and the rights of the general owner are subject to the lien and operation of the contracts so made.

II. Because he, by the contract with Holmes for the sale of the vessel, and the delivery of the vessel to him under and in pursuance of the provisions of that contract, is, in law, deemed to have taken the risks of its becoming hypothecated, to answer for the breach of any and all maritime contracts, as well as damages sustained by collision and all other marine torts. If it became so hypothecated, it would, in case of a forfeiture of the conditional contract, revert to him *cum onere.*

III. Because he allowed Holmes to hold himself out to the world as the owner of the vessel. He will not, therefore, be permitted to gainsay his acts, especially as against these appellees, who are innocent parties, and have no power to prevent his

Schooner Freeman, &c. v. Buckingham et al.

wrongful doings. If any one is to suffer, it should be the appellant. The liens of the maritime law should not be in this way avoided when contracted by third parties, in the ordinary course of business, with the master of the vessel, relative to her ordinary employment, under the sanction of the ostensible owner. The rights of parties would be far better guarded, and the interests of commerce be far better subserved, by protecting persons who deal with the ostensible owner of a vessel, than by favoring those who seek to reap the rewards of the business, but avoid its risks and responsibilities under the cover of a contract like that set up in this case.

13. The provisions of the decree, relative to the securities given to Mr. Morrison, are right. This court cannot marshal these assets, and the decree gives the appellant all the rights to the securities that the appellees have, and this is all he can claim in equity.

14. The appellant should be required to pay the costs personally, because the fund realized from the sale of the vessel is insufficient to pay the appellee's claim; and if their costs were decreed to be paid from that fund, it would be in effect to decree that they pay their own costs, which would be manifestly inequitable.

15. The decree should be affirmed, with costs to be paid by the appellant personally.

Mr. Justice CURTIS delivered the opinion of the court.

This is an appeal from a decree of the circuit court of the United States for the northern district of New York.

The appellees filed their libel in the district court, alleging that they are the consignees named in two bills of lading, signed by the master of the Schooner Freeman, which certify that certain quantities of flour had been shipped on board the schooner by S. Holmes and Company, at Cleveland, in the State of Ohio, to be carried to Buffalo, in the State of New York, and there safely delivered—dangers of navigation excepted—to an agent named in the bills of lading, to be by him forwarded to the libellants, in the city of New York. That though this merchandise was thus consigned to the libellants for account of the shipper, yet, on receipt of the bills of lading, and on the faith thereof, the libellants made advances to the shippers. That thirteen hundred and sixty barrels of the flour mentioned in the bills of lading were not delivered at Buffalo, though the delivery was not prevented by any danger of navigation.

In accordance with the prayer of the libel, the schooner was arrested, and the appellant intervened as claimant.

It appeared that, a short time before these bills of lading were

signed, the claimant, being the sole owner of the schooner, contracted with John Holmes to sell it to him for the sum of $4,000, payable by instalments of $500, at different dates; that, by the contract, John Holmes was to take possession of the vessel, and if he should make all the agreed payments, the claimant was to convey to him; that only one instalment had become payable, and had been paid, when the vessel was arrested; that the vessel was delivered to John Holmes, under this contract, and he allowed his son, Sylvanus Holmes, to have the entire control and management of the schooner, which was in his employment, and victualled and manned by him, and commanded by a master whom he appointed, at the time the bills of lading in question were signed.

It further appeared that Sylvanus Holmes transacted business under the style of S. Holmes and Company; that the flour mentioned in these bills of lading as having been shipped by him, and which the master failed to deliver, never was in fact shipped—nor, so far as appeared, had Sylvanus Holmes any such flour; and that he induced the master to sign the bills of lading by fraud and imposition, intending to use them—as he did use them—as instruments to impose on the libellants, and obtain advances on the faith thereof.

To state succinctly the legal relations of these parties, it may be said, that the claimant was the general owner of the vessel; that Sylvanus Holmes was owner *pro hac vice;* that the libellants are holders of the bills of lading, for a valuable consideration parted with, in good faith, on the credit of the bills of lading; but that the bills of lading themselves are not real contracts of affreightment, but only false pretences of such contracts; and the question is, whether they can operate, under the maritime law, to create a lien, binding the interest of the claimant in the vessel.

Under the maritime law of the United States the vessel is bound to the cargo, and the cargo to the vessel, for the performance of a contract of affreightment; but the law creates no lien on a vessel as a security for the performance of a contract to transport cargo, until some lawful contract of affreightment is made, and a cargo shipped under it.

In this case there was no cargo to which the ship could be bound, and there was no contract made, for the performance of which the ship could stand as security.

But the real question is, whether, in favor of a *bonâ fide* holder of such bills of lading procured from the master by the fraud of an owner *pro hac vice,* the general owner is estopped to show the truth, as undoubtedly the special owner would be. This question does not appear to have been made in the court below,

the distinction between the special and general owner not having been insisted on. So large a part of the carrying trade of this country is carried on in vessels of which the masters, or other persons, are owners *pro hac vice*, and the practice of taking security by way of mortgage of vessels has become so common, while, at the same time, the confidence placed in bills of lading as the representatives of property is so great and so important to commerce, that the relative rights of the holders of such documents, and of the general owners and mortgagees of vessels, which are involved in this case, are subjects of magnitude; and the case has received the attentive consideration of the court.

The first and most obvious view which presents itself is, that the claimant in this case is not personally liable on these bills of lading. The master who signed them was not his agent, and they created no contract between him and the consignor or consignee, or any third person who might become their holder. Abbot on Shipping, 42 and note, 57 and note. And it has been laid down by the high court of admiralty in England, (The Druid, 1 Wm. Rob. 399,) that "in all causes of action which may arise during the ownership of the persons whose ship is proceeded against, I apprehend that no suit could ever be maintained against a ship, where the owners were not themselves personally liable, or where their personal liability had not been given up, as in bottomry bonds by taking a lien on the vessel. The liability of the ship, and the responsibility of the owners in such cases, are convertible terms; the ship is not liable if the owners are not responsible; and, *vice versâ*, no responsibility can attach on the owners if the ship is exempt and not liable to be proceeded against." See also The Bold Buccleugh, 2 Eng. Law and Eq. 537.

Though this language is broad enough to cover all cases, whether of contract or tort, it should be observed that the case before the court was one of wilful tort by the master, and that there was no occasion to advert to any distinction between a general and special owner, or to consider whether the interest of the former in the vessel could be bound by the act of the latter, or of the master appointed by him.

We are of opinion that, under our admiralty law, contracts of affreightment, entered into with the master, in good faith, and within the scope of his apparent authority as master, bind the vessel to the merchandise for the performance of such contracts, wholly irrespective of the ownership of the vessel, and whether the master be the agent of the general or the special owner.

In the case of The Phebe, Ware's R. 263, Judge Ware has traced the power of the master to bind the vessel by contracts of affreightment to the maritime usages of the middle ages. So

far as respects such contracts made by the master in the usual course of the employment of the vessel, and entered into with a party who has no notice of any restriction upon that apparent authority, those maritime usages may safely be considered to make part of our law; though we should hesitate to declare that their effect has not been modified by our own commercial law, which has recognized interests and rights unknown to the commercial world when those usages obtained. And we desire to be understood as not intending to say that all contracts made by a master within the usual scope of his employment, which, by the ancient maritime law, would have created liens on the vessel, will now do so, in such manner as to bind the interests in the vessel of parties whom he does not represent as agent. For the ground on which we rest the authority of a master, who is either special owner or agent of the special owner, is, that when the general owner intrusts the special owner with the entire control and employment of the ship, it is a just and reasonable implication of law that the general owner assents to the creation of liens binding upon his interest in the vessel, as security for the performance of contracts of affreightment made in the course of the lawful employment of the vessel. The general owner must be taken to know that the purpose for which the vessel is hired, when not employed to carry cargo belonging to the hirer, is to carry cargo of third persons; and that bills of lading, or charter-parties, must, in the invariable regular course of that business, be made, for the performance of which the law confers a lien on the vessel.

He should be considered as contemplating and consenting that what is uniformly done may be done effectually; and he should not be allowed to say that he did not expect, or agree, that third persons, who have shipped merchandise and taken bills of lading therefor, would thereby acquire a lien on the vessel which he has placed under the control of another, for the very purpose of enabling him to make such contracts to which the law attaches the lien. See The Cassius, 2 Story, 93; Webb v. Pierce, 1 Curtis, 107.

But if this be the ground upon which the interest of the general owner is subjected to liens, by the act of those who are not so his agents as to bind him personally, this ground wholly fails in the case at bar.

There can be no implication that the general owner consented that false pretences of contracts, having the semblance of bills of lading, should be created as instruments of fraud; or that, if so created, they should in any manner affect him or his property. They do not grow out of any employment of the vessel; and there is as little privity or connection between him, or his vessel,

and such simulated bills of lading, as there would be between him and any other fraud or forgery which the master or special owner might commit.

Nor can the general owner be estopped from showing the real character of the transaction, by the fact that the libellants advanced money on the faith of the bills of lading; because this change in the libellant's condition was not induced by the act of the claimant, or of any one acting within the scope of an authority which the claimant had conferred. Even if the master had been appointed by the claimant, a wilful fraud committed by him on a third person, by signing false bills of lading, would not be within his agency. If the signer of a bill of lading was not the master of the vessel, no one would suppose the vessel bound; and the reason is, because the bill is signed by one not in privity with the owner. But the same reason applies to a signature made by a master out of the course of his employment. The taker assumes the risk, not only of the genuineness of the signature, and of the fact that the signer was master of the vessel, but also of the apparent authority of the master to issue the bill of lading. We say the apparent authority, because any secret instructions by the owner, inconsistent with the authority with which the master appears to be clothed, would not affect third persons. But the master of a vessel has no more an apparent unlimited authority to sign bills of lading, than he has to sign bills of sale of the ship. He has an apparent authority, if the ship be a general one, to sign bills of lading for cargo actually shipped; and he has also authority to sign a bill of sale of the ship, when, in case of disaster, his power of sale arises. But the authority, in each case, arises out of, and depends upon, a particular state of facts. It is not an unlimited authority in the one case more than in the other; and his act, in either case, does not bind the owner, even in favor of an innocent purchaser, if the facts upon which his power depended did not exist; and it is incumbent upon those who are about to change their condition, upon the faith of his authority, to ascertain the existence of all the facts upon which his authority depends.

Though the law on this point seems to have been considered in Westminster Hall not to have been settled, when the eighth edition of Abbot on Shipping was published, in 1849, (Ab. on Sh. 325,) we take it to be now settled, by the cases of Grant v. Norway, 2 Eng. Law and Eq. 337; Hubbersty v. Ward, 18 ibid. 551; and Coleman v. Riches, 29 ibid. 323.

The same law was much earlier laid down in Walter v. Brewer, 11 Mass. 99.

But the case at bar is much stronger in favor of the claimant, because the master was not appointed by him, and the signature

of the bills of lading was obtained by the fraud of the special owner.

In Gracie *v.* Palmer, 8 Wheat. 605, the question came before this court, whether the charterer and the master could, by a contract made with a shipper who acted in good faith, destroy the lien of the owner on the goods shipped, for the freight due under the charter-party. It was held they could not; and the decision is placed upon the ground of want of authority to do the act. It was admitted by the court that the charterer and master might impose on a shipper in a foreign port, by making him believe the charterer was owner, and the master his agent. But it was considered that so far as respected the owner, the risk of loss from such imposition lay on the shipper. So, in this case, even if the special owner and the master had combined to issue these simulated bills of lading, they could not create a lien on the interest of the general owner of the vessel. Upon the actual posture of the facts, the master having been defrauded by the special owner into signing the bills of lading, it would be difficult to distinguish them, so far as respects the rights of the claimant, from bills forged by the special owner. On these grounds, we are of opinion that, upon the facts as they appear from the evidence in the record, the maritime law gives no lien on the schooner; that the claimant is not estopped from alleging and proving those facts; and, consequently, that the decree of the court below must be reversed, and the cause remanded, with directions to dismiss the libel, with costs.