## Case No. 12,079.

### ROSS v. The NEVERSINK.[1]

District Court, S. D. New York. Dec., 1866.[2]

MARITIME LIENS — SUPPLIES PURCHASED IN FOREIGN PORT — AUTHORITY OF MASTER.

[1. When necessary supplies are properly furnished to a vessel, on her credit, in any state out of which she belongs, a lien upon her is given by the general maritime law.]

[2. The authority of a master to bind a vessel in a foreign port for necessary supplies is not affected by the fact that he is also one of the charterers and owners pro hac vice.]

[3. A vessel is liable for necessary supplies purchased in a foreign port by its master, who is also one of the charterers, and consequently without authority to bind the owners, and who has no funds or credit belonging to himself or the vessel.]

[Cited in The James Guy, Case No. 7,195; The A. R. Dunlop, Id. 513.]

In admiralty.

Welch & Donohue, for libelant.

D. & T. McMahon, for claimant.

SHIPMAN, District Judge. R. Cornell White, owner of the steamboat Neversink, on the 12th of March, 1866, chartered her to Benjamin C. Thornal and Lewis B. Hine. She was to be run on safe water, and not more than ninety miles per day. The owner was to appoint the pilot and engineer, and the charterers were to pay them, as well as all the other running expenses of the boat, including wages, fuel, etc., and pay the owner ninety ($90) per day as charter money. The charterers put her on the route from New York, where both they and the owner reside, to New Brunswick, in the state of New Jersey, and continued to run her there until some time in April of the same year. Among other necessary supplies, the boat needed coal, which was purchased by the master of the libelants, from time to time, at New Brunswick, where the latter reside and carry on their business of coal merchants, and was there delivered to the boat. The coal was purchased by the master for the exclusive use of the boat, and was used to enable her to perform her trips on the route, over which she daily ran, carrying passen-

---

[1] [Not previously reported.]

[2] [Affirmed in Case No. 10,133.]

gers and freight. The coal was charged by the libelants, on their books, as they delivered it, to the "Steamboat Neversink and owners"; and, not being all paid for, this libel is brought to recover the balance still due. The libel alleges that Thornal was master, and purchased the coal acting for and on behalf of the owners, and that the same was supplied on the credit of the boat and owner. The owner filed his claim, denying that Thornal was master, or had any authority as such, or as agent of the boat; sets out the substance of the charter party; avers that the libelants had knowledge of the same at the time when the coal was furnished, that they furnished the same on the credit of the charterers, and that the latter had means and credit at New Brunswick for that purpose. The answer also alleges that the Neversink is a domestic vessel, and that no maritime lien attached in favor of the libelants for these supplies of coal, and that, therefore, this court has no jurisdiction over the cause.

The question raised by the last allegation cited may be disposed of in a few words. The supplies in question were confessedly furnished in a state out of that to which the vessel belongs. In view of our maritime laws, for all purposes of this nature, the several states are foreign to each other. When, therefore, necessary supplies are properly furnished to a vessel, on her credit, in any state out of which she belongs, a lien upon her is given by the general maritime law, which the admiralty courts of the United States uniformly enforce. This doctrine is too familiar and well settled to require citation of authorities here in support of it. See 1 Pars. Mar. Law, p. 492, and notes.

The main struggle of the parties in the present case is over the question whether or not the act of the master, under the circumstances, bound the boat for the payment of this coal. So far as this question depends upon principles of law, the doctrines laid down in Thomas v. Osborn [19 How. (60 U. S.) 22] and Pratt v. Reed [Id. 359] must guide this court. I do not feel called upon to discuss how far, if at all, those cases have modified the law as it existed before. The rules enunciated in them by the supreme court are explicit, and it is the duty of this court to apply them whenever a proper state of facts is presented. The fact that the master in this case was one of the charterers, and that he and the other charterers were owners pro hac vice, does not affect the right of the libelants to maintain this suit. Owners pro hac vice cannot, without a special authority, bind the real owners personally; but this being an action in rem, and not in personam against the owners, that question is not in the case. In the case of Thomas v. Osborn, 19 How. [60 U. S.] 29, Mr. Justice Curtis, in delivering the opinion of the court, says: "Nor do we think the fact that the master was charterer and owner pro hac vice necessarily deprived him of this power. It is

true, it does not exist in a place where the owner is present. The St. Jago de Cuba, 10 Wheat. [23 U. S.] 409. But this doctrine cannot be safely extended to the case of an owner pro hac vice in command of the vessel. Practically, this special ownership leaves the enterprise subject to the same necessities as if the master was master merely and not the charterer, and the maritime law gives him the same power to borrow to meet that necessity as if he were not charterer." Again, on page 30: "In our law, if the master is the agent of the owners, his contracts are obligatory on them personally. When he acts on his own account, he does not create any obligation on them. But it does not follow that he may not bind the vessel. In Hickox v. Buckingham,—18 How. [59 U. S. 182],—it was held that contracts of affreightment entered into by the master, within the scope of his apparent authority as master, bind the vessel to the merchandise for the performance of such contracts, wholly irrespective of the ownership of the vessel, and whether the master be the agent of the general or special owner; and this upon the principle that the general owner must be presumed to consent, when he lets the vessel, that the master may make such contracts, which operate as a tacit hypothecation of the vessel." This doctrine loses none of its force when applied to the act of the master in procuring necessary supplies to navigate his vessel. Valin says: "Through all time, by the use and customs of the seas, it has been allowable for the master to borrow money on bottomry, or otherwise upon the hull and keel of the vessel, for repairs, provisions, and other necessaries, to enable him to continue his voyage." He has the same authority to do this when he is charterer and special owner as when he is master only. In the one case he can only bind the ship and himself personally; in the other, he can bind both the ship and his general owners, as well as himself.

We come now to the question whether the master, in this case, by his contract with the libelants, bound the Neversink to pay for the coal furnished. The solution of this question depends upon three facts: First, whether it was needful; second, whether it was furnished on the credit of the ship; and, third, whether there was an apparent necessity for the master to have credit to enable him to procure it. That the coal was needful to enable this steamboat to perform her trips, needs no argument to prove. A regular and daily supply was indispensable to her employment, and to enable her charterers to earn the means of paying the general owner the charter money stipulated. I think, too, that the testimony shows that it was furnished on the credit of the boat; that both Capt. Thornal and the libelants so understood it. The captain had not available means adequate to this purpose, and before he purchased the coal in question, he says, he ap-

plied to his co-charterer, and found that he had none. The libelants charged, in every instance the coal to "Steamboat Neversink and owners." See The Chusan [Case No. 2,-717]. I conclude, therefore, that it was understood by both parties to the purchase that the boat would be responsible for the payment. No doubt Capt. Thornal intended to pay for the coal out of the earnings of the boat (and he did, in fact, pay some); but I find nothing in the proof to warrant the inference that either he or the libelants understood that the contract rested on his personal credit. It remains to be considered whether there was an apparent necessity for the master to have this coal on the credit of the boat. In the case of Thomas v. Osborn, already cited, Mr. Justice Curtis, speaking for the majority of the court (19 How. [60 U. S.] 31), says: "To constitute a case of apparent necessity, not only must the supplies be needful, but it must be apparently necessary for the master to have a credit to procure them. If the master has funds of his own which he ought to apply to the purchase of supplies which he is bound by the contract of hiring to furnish himself, or if he has funds of the owners, which he ought to apply to pay for the repairs, then no case of actual necessity exists. And if the lender knows these facts, or has the means, by the use of due diligence, to ascertain them, then no cause of apparent necessity exists to have a credit; and the act of the master in procuring a credit does not bind the interest of the general owners of the vessel." And Mr. Justice Nelson, speaking for the court in Pratt v. Reed, 19 How. [60 U. S.] 331, declares that the existence of this apparent necessity for a credit upon the vessel, at the time of procuring the supplies, must be proved. His language is, "This proof is as essential as that of the necessity of the article itself." Now, it appears from the proofs that the master had no funds of the general owner, and therefore could apply none to the purchase of this coal. An effort was made on the trial to prove that White, the general owner, was well known in New Brunswick, where the coal was purchased, to be a man of property, and that he had a credit there to which the master might have resorted. This attempt failed, for only one person there is proved to have known him. But if he was ever so well known there, and had undoubted credit in that market, it is difficult to see how this fact could tend to prove that no necessity existed for the master to resort to the credit of the boat; for he, being charterer, could not have bound the owner personally, and therefore the credit of the owner would have been of no avail to the master. This would have certainly been the case had the general owner been known to the libelants, and with reasonable diligence they could have ascertained that Thornal and Hine were special owners. The master would then not have been apparently the agent of the general owner, and therefore could not have made a valid contract on his behalf, or one by which he would have been bound. It appears that, at the time of the purchase of this coal, Thornal had in his hands, arising out of the current earnings of the boat, three or four hundred dollars, but he at the same time had other and pressing demands, arising out of the necessary and daily wants of the boat. The crew were to be paid, and a multitude of items which go to make up the running expenses of such a boat to be attended to. This small amount was no more than a prudent man engaged in such an enterprise ought to have kept on hand from day to day. The only other evidence touching the pecuniary ability of the master simply shows that he was engaged in a heavy speculation in oats, and had twelve or fourteen thousand dollars invested in it, carrying, as he says, a large quantity "on a margin." The speculation was not in New Brunswick, where the coal was purchased, but in New York or Brooklyn. These oats, or the speculative contract relating to them, were not available funds in the hands of the master, such as the maritime law regards as sufficient to take away his authority to resort to the credit of his vessel. Whether he could have disposed of his interest in this speculation, in the then state of the market, and had a dollar left, does not appear.

The conclusion, on the whole case, is that he bound the boat in this contract with the libelants. Let a decree be entered in their favor, and, unless the parties can agree in regard to the amount, let an order of reference be made to a commissioner to ascertain and report the amount due.

[On appeal to the circuit court, the decree of this court was affirmed. Case No. 10,133.]