## THE ASPHODEL.[1]

### MURRAY et al. v. NATIONAL CORDAGE CO.

(District Court, S. D. New York. January 21, 1893.)

CARRIERS BY WATER—BILL OF LADING TO CHARTERER—RECITALS AS TO CARGO RECEIVED NOT CONCLUSIVE—MISTAKE IN TALLY.
   A ship does not guaranty that the amount of cargo recited in her bills of lading as received on board, and based on her tally, has been actually so shipped and received; nor can the vendor and vendee of such goods,

[1] Reported by E. G. Benedict, Esq., of the New York bar.

by any private arrangement, make the ship an insurer of the correctness of her tally, as against fraud or mistake, for their benefit, and as a fulfillment of the vendor's contract, when not fulfilled in fact; and where there is proof of fraud or mistake the ship and owners cannot be held accountable to the consignee beyond the number actually received on board.

In Admiralty. Libel by John B. Murray and Thomas M. McCrindall to recover freight. Decree for libelants.

Convers & Kirlin, for libelants.

Charles L. Atterbury, for respondents.

BROWN, District Judge. The libelants are the owners of the steamship Asphodel, which on the 28th of December, 1891, delivered to the respondents at New York a cargo of hemp from Manilla, consisting of 17,014 bales. The above libel was filed to recover the sum of $863.04, the balance of the freight due thereon, which the respondents withhold, by reason of their claim of an offset to that amount for the nondelivery of 48 additional bales included in the bills of lading signed by the master. I am satisfied from the evidence that beyond any doubt the steamer delivered to the respondents all the bales that were shipped; and the only question for decision is whether the libelants are bound to make good the value of the missing 48 bales. There is no exception in the bills of lading that expressly covers any mistake in the number receipted for.

The respondents' claim to be in the situation of indorsees for value of the bills of lading, and as such entitled to have the ship account for the whole number of bales receipted for, whether shipped on board or not, in accordance with the rule prevailing in the courts of this state and of some other states. Armour v. Railway Co., 65 N. Y. 111; Bank of Batavia v. New York, L. E. & W. R. Co., 106 N. Y. 195, 12 N. E. Rep. 433. In the federal courts, however, the rule as to the liability of vessels and their owners upon the masters' bills of lading is more limited, as was finally determined by the supreme court in the case of Pollard v. Vinton, 105 U. S. 7, reaffirming the case of Freeman v. Buckingham, 18 How. 182. These decisions have been repeatedly held in this district and in others, to be applicable as against bona fide indorsees of the bills of lading. The Loon, 7 Blatchf. 244; Crenshawe v. Pearce, 37 Fed. Rep. 432; Robinson v. Railroad Co., 9 Fed. Rep. 129; O'Brien v. 1,614 Bags of Guano, 48 Fed. Rep. 726, 729. Upon these authorities the offset could not be sustained, even if the respondents were in the situation of bona fide indorsees.

Upon the facts proved, or admitted in the stipulation, however, I do not think the respondents are in that situation. They were the charterers of the Asphodel under a charter of affreightment, which required the steamship to proceed to Manilla, and "there load from the agent of the said charterers a full and complete cargo of hemp, in the usual bales; and thence to proceed to New York and to deliver the same on payment of freight, at the rate of 65 shillings sterling per ton of 8 bales." The master was to sign bills of lading as presented, without prejudice to the charter. The context, however, shows that this printed clause in the charter had reference to the

shipment of goods for third persons who were to pay freight to be credited on the charter hire, which, therefore, did not become applicable to this case. The charterers, as the agreed statement of facts sets forth, thereupon contracted for the purchase and shipment of 14,062 bales of hemp from the firm of Stevenson & Co., and of 3,000 bales from Smith, Bell & Co., both of Manilla, which were to be transported to the port of New York by the Asphodel; the purchase price to be paid by the charterers upon presentation to the charterers' agent in London of the bills of lading for the hemp signed and issued by the master of the steamship. The master had no knowledge of this arrangement. The bills of lading were signed by the master upon the faith of a tally of the number of bales taken by the mate as the bales were delivered to the ship from lighters. The evidence shows not only a liability to honest mistake in such a tally, but clear evidence of attempted fraud upon the ship in this instance. The bills of lading recited the goods as shipped by W. F. Stevenson & Co. and by Smith, Bell & Co., respectively, deliverable to order; and the bills were indorsed in blank by the shippers named. The bills of lading, with drafts attached, were thereupon forwarded by the shippers to the agents of the respondents at London, who thereupon paid the price of the whole number of bales stated in the bills of lading for account of the respondents. The bills of lading refer to the charter party.

From the above it appears that the respondents were the freighters of the ship. They contracted to load her with a "cargo of hemp" through their agent at Manilla. The ship received her cargo there through Stevenson & Co., who appear to have been the only persons there to act as the agent of the charterers in loading her. The hemp which Stevenson & Co. caused to be put on board, was shipped by virtue of their contract with the respondents. They, with Smith, Bell & Co., had agreed to load 17,062 bales; but they actually put on board 48 bales less, either through mistake, or fraud, the evidence leaves uncertain which. The bales shipped were shipped under their contract with the respondents, and on their account. The bills of lading, as between the shippers and the respondents, were not subject to the "order" of the shippers. They had no right or power, after the delivery to the charterers' vessel, which the latter had sent to Manilla to receive this hemp, to divert it from the respondents by any sale or delivery to any other person than the respondents, at least not until after a breach of the contract by the respondents. The bills of lading, though in form made to order, and indorsed in blank by the shippers, were in no wise different, in legal effect, than if they had made the hemp deliverable to the respondents directly. No different use was attempted to be made of the bills of lading; and they were not negotiated, but were delivered to the respondents' agent in London, precisely as they would have been delivered, had they been made out deliverable to the order of the respondents. If so made out, plainly the facts would not amount to any negotiation.

The true view of the facts, as it seems to me, is simply that the shippers undertook to ship and deliver the above number of bales

to the respondents. They did not ship as many by 48 as they agreed to ship; nor as many as by their drafts upon the bills of lading they represented that they had shipped. They obtained from the master, either through mistake or fraud, bills of lading for a greater number than was put on board; and in that way they procured from the respondents payment for 48 bales more than they had shipped, and payment for their full contract without having performed it. If the ship or her owners were held liable in such a case, the effect would be to make them guarantors and insurers of the correctness of a tally as against all possible mistake or fraud; and that too without any negotiation of the bills of lading, but simply as between consignor and consignee, or vendor and vendee, under a secret arrangement for their convenience to enable the vendor to get payment before delivery to the consignee. To hold the ship to such a liability, would be not only in plain contradiction of the authorities above cited, but a plain enlargement and perversion of the ship's business from that of simple transportation, to that of guarantor and insurer against fraud or mistake in the execution of contracts between vendor and vendee for their convenience. That is not the proper business of the ship, or of her officers. The vendor and vendee could not make the ship or her owners responsible for the exact performance of the contract between themselves by means of the ship's tally taken for the purpose merely of giving the receipt in the bills of lading. The shipper plainly could base no conclusive claim upon such a tally; nor can the consignee, because neither the tally nor the bills of lading were given for the purpose of authorizing payment by the consignee before delivery or without any verification of the ship's count; nor was the consignee authorized to make use of the tally for such a purpose, except at his own risk, as regards fraud or mistake.

There has long been, no doubt, a recognized tendency in favor of commercial dealings in goods in transit, to which dealings the ship is no party, to make the ship responsible, by the application of the principle of equitable estoppel, for the accuracy of the receipt stated in the bill of lading. This has never been by any acquiescence or agreement on the part of the carrier. In self-defense and to protect themselves against liabilities which they never intended to assume and for which they have received no corresponding remuneration, masters and ship owners have long been in the habit of inserting various restrictions and exceptions in order to guard against such responsibility. Under the construction of the bill of lading and of the master's authority in the federal courts, such qualifying words, as regards the amount, weight, etc., of the goods shipped, are less necessary than in tribunals where a more extended responsibility is enforced. In the present case the insertion of the clause "weight, measure, quality, contents, and value unknown," though the word "number" is omitted, probably accidentally, indicates clearly the general purpose to limit the ship's responsibility under the receipt clause of the bill of lading. Even under the most extended liability as enforced in the courts of this state, it is held that "the recital in the bill of lading that the contents of the packages

were unknown would have left the defendant free from responsibility for a variance of the actual contents from those described in the bill of lading." Bank of Batavia v. New York, L. E. & W. R. Co., 106 N. Y. 195, 202, 12 N. E. Rep. 433.

The ship, when a common carrier, is an insurer of the goods taken on board as against all perils not lawfully excepted; but not an insurer as regards goods not shipped. She is bound to care and diligence in keeping tally and in receipting for a specific quantity of goods. The recitals in the bills of lading of the amount of goods shipped are entitled to weight. But none of these constitute, in the federal courts, any estoppel against proof of fraud or mistake. The remedy of the respondents is against the shippers.

Decree for the libelants, with costs.