UNITED STATES of America,
Libelant,

v.

The S.S. LUCIE SCHULTE, her engines, boilers, etc. and Three Bays Lines, Inc., Respondents, and against Schulte & Bruns, Claimant.

United States District Court
S. D. New York.
March 2, 1964.

Robert M. Morgenthau, U. S. Atty., S. D. New York, for libelant; Louis E. Greco, Atty. in Charge, William H. Postner, Admiralty & Shipping Section, Dept. of Justice, advocate.

Healy, Baillie & Burke, New York City, for claimant; Walter G. McNeill, New York City, advocate.

DAWSON, District Judge.

This is an action brought against a carrying vessel *in rem* by the United States of America under the general maritime law, pursuant to 28 U.S.C. § 1333(1), to recover overpayments of freight for the transportation of shipments of Government property on three voyages of the SS LUCIE SCHULTE. The SS LUCIE SCHULTE herself is not within the jurisdiction, but an undertaking to answer for any liability of the ship has been executed and filed.

At all times relevant to this action the vessel was under time charter to Three Bays Lines, Inc., which is named in the libel as a respondent but which was not served with process and which has not appeared. It was stated on argument that Three Bays Lines, Inc. is now

insolvent. Schulte & Bruns, the owner of the vessel, has appeared as claimant.

Trial was before the Court without a jury on exhibits and a stipulation of facts.

Three shipments of cargo are involved. In each case the cargo was delivered by libelant to the SS LUCIE SCHULTE at Port Canaveral for transportation to Antigua or Trinidad. United States Government forms were used for the Bills of Lading. The transportation company was designated on the bills as "Three Bays Line (MS MV LUCIE SCHULTE)," and the bills were signed by an officer or agent of respondent. After delivery in each case a voucher for transportation charges was executed by respondent and submitted to libelant. The vouchers contained the following payee's certificate:

"I certify that the account stated hereon, as evidenced by the attached subvouchers, is correct and just; that the services have been rendered as indicated; that the payment has not been received; and that the rates charged are not in excess of the lowest net rates available for the Government, based on tariffs effective at the date of service."

The amounts billed and paid were $11,038.76; $10,071.15; and $10,366.34. The correct freight was $8,899.79; $8,775.16; and $9,512.44, respectively. The total overpayment was $4,288.86. There is no dispute as to the overpayments made and the Government's right to recover them. The sole question is whether recovery may be had against the vessel *in rem.*

The liability asserted here is not one against the owner of the vessel or the charterer, but against the vessel itself. This liability has firm roots in the general maritime law.

"Now, it is a doctrine not to be found in any treatise on maritime law, that every contract by the owner or master of a vessel, for the future employment of it, hypothecates the vessel for its performance. This

lien or privilege is grounded on the rule of maritime law as stated by Cleirac (597:) 'Le batel est obligee a la marchandise et la marchandise aubatel.' The obligation is mutual and reciprocal. The merchandise is bound or hypothecated to the vessel for freight and charges (unless released by the covenants of the charter-party,) and the vessel to the cargo." Vandewater v. Mills (The Yankee Blade), 60 U.S. (19 How.) 82, 15 L.Ed. 554 (1857).

■ The lien in favor of the cargo has its source in the contract of affreightment. The lien is justified as a means by which the vessel, treated as a personality, is impliedly hypothecated to secure the performance of the contract and is made answerable for nonperformance. The lien is secret and may operate to the prejudice of general creditors and purchasers without notice. The lien is therefore *stricti juris* and cannot be extended by construction, analogy or inference. See, Osaka Shosen Kaisha v. Pacific Export Lumber Company, 260 U.S. 490, 43 S.Ct. 172, 67 L.Ed. 364 (1923); Krauss Bros. Lumber Co. v. Dimon Steamship Corp., 290 U.S. 117, 54 S.Ct. 105, 78 L.Ed. 216 (1933).

■ Although the maritime lien is *stricti juris*, it has been upheld whenever within accepted supporting principles. That an action *in rem* against the vessel may be brought for overpayment of freight charges was decided in the Supreme Court opinion in Krauss Bros. Lumber Co. v. Dimon Steamship Corp., 290 U.S. 117, 54 S.Ct. 105, 78 L.Ed. 216 (1933).

In the Krauss case the shipper contracted with the owner of the vessel to carry lumber at a rate of ten dollars per thousand feet, with the condition that in the event "a regular intercoastal carrier moves a similar cargo at a lower rate," such lower rate would govern. While the vessel was discharging her cargo the ten dollar rate was demanded and received although a regular intercoastal carrier had carried a similar car-

go during the same period at eight and one-half dollars per thousand feet. An overpayment of freight was therefore established and the Supreme Court upheld *in rem* jurisdiction over the ship. The lien of the cargo on the ship was found to extend to secure repayment of the excessive freight charges.

Claimant Schulte & Bruns argues that two distinctions between the Krauss case and the case at bar make the Krauss case inapplicable: (1) in Krauss there was no charterer, the contract of carriage being executed by the owner; (2) in Krauss the freight payment was made before the cargo was unloaded. As the ensuing discussion shows, neither distinction is of any substance.

*Participation by the Charterer.* Claimant asserts that the Krauss case was based on the fact that the contract of affreightment was made directly with the owner of the ship, and that when a charterer is involved, a lien exists only when allowed by the terms of the charter party. Claimant argues by analogy with the provisions of the statutory maritime lien created by 46 U.S.C. §§ 971–975.

■■ Sections 971–975 of 46 U.S.C., provide a statutory maritime lien for repairs, supplies, towage, use of dry dock or marine railway, or other necessaries. Officers and agents appointed by a charterer are presumed to have the authority to bind the ship, but the furnisher does not acquire a lien if the officer or agent has no actual authority and the furnisher could have so ascertained by exercise of reasonable diligence. Reasonable diligence includes inquiry into the terms of a charter party. Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co. of California, 310 U.S. 268, 60 S.Ct. 937, 84 L.Ed. 1197 (1940).

■ The non-statutory maritime lien on the vessel for performance of the contract of carriage can similarly be incurred by officers and agents appointed by a charterer.

"The general owner * * * should not be allowed to say that he did not expect, or agree, that third persons, who have shipped merchandise and taken bills of lading therefor, would thereby acquire a lien on a vessel which he had placed under the control of another, for the very purpose of enabling him to make such contracts to which the law attaches the lien." The Schooner Freeman v. Buckingham, 59 U.S. (18 How.) 182, 190, 15 L.Ed. 341 (1856). See also, The Poznan, 276 F. 418 (S.D.N.Y. 1921).

■ Claimant argues that by analogy the non-statutory maritime lien should not arise unless the charterer has actual authority to incur the lien.

However, there is no reason or authority indicating that the statutory provision putting a furnisher on notice of the terms of a charter party should have a parallel in the case of a shipper. The law has traditionally been very solicitous of goods and passengers transported on common carriers, more so than with other persons dealing with carriers. Furnishers are in a much better position than shippers to inquire into the terms of a charter party.

The charter parties in force at all relevant times contained the following provision:

"* * * Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners in the vessel."

This clause in the charters appears to be directed at bringing 46 U.S.C. § 973 into play and preventing the lien for necessaries from arising, and probably was not intended to apply to the common law lien for carriage. But even if the clause had been explicit in prohibiting the common law lien, it would not have that effect. The lien can be incurred by the officer or agent of the charterer and the owner cannot prevent the lien from arising by any contract between the owner and the charterer.

*Union Between Ship and Cargo*. The contract of affreightment does not itself create any liens; the liens do not attach until the cargo is on board or in the master's custody. Osaka Shosen Kaisha v. Pacific Export Lumber Co., supra. There must be a union between ship and cargo. Claimant contends that there should be a similar limitation on the liens at the end of the voyage; that no liens can arise after the goods have been discharged. It is true that the lien of the ship against the cargo is waived after discharge and delivery of the cargo, but the lien of the cargo against the ship is a different matter.

The obligation between ship and cargo is often said to be "mutual and reciprocal," but this is not strictly so. There is a key difference between the two obligations. The lien of the cargo on the ship is an hypothecation or pledge of the ship. It is a privilege to hold the ship accountable for the proper performance of her obligation. The lien of the ship on the cargo, on the other hand, is not a privilege but a right to retain possession of the cargo until the freight is paid. It is based upon possession and may be lost by delivery of the cargo. The Krauss case itself dispels claimant's argument:

"The suggestion made on the argument that the lien asserted here, after the cargo is discharged, is affected by application of the often stated rule that the liens on ship and cargo are mutual and reciprocal, is without basis. It is only the obligations of ship and cargo under the contract of affreightment which are to be characterized as mutual and reciprocal, not the liens which result from the breach of those obligations. The one lien may come into existence without the other and the lien on the ship in favor of cargo, not being possessory * * * may survive the lien of ship on cargo which is terminated by unconditional delivery." (At p. 125–126 of 290 U.S., 107–108 of 54 S.Ct., 78 L.Ed. 216).

Claimant seizes upon the following language in the Krauss case to distinguish the case at bar:

"Here, as there, the overpayment, made as the cargo was unloaded, occurred while the union of ship and cargo continued, and the liability asserted was determined by events contemporaneous with that union." (At p. 125 of 290 U.S., 107 of 54 S.Ct., 78 L.Ed. 216).

This language was not used by the Court as a *sine qua non* for liability, however. It was used to show the similarity between the Krauss case and other prior cases. The factual situation before this Court is slightly different from that before the Krauss Court, but the reasoning of Krauss controls nevertheless.

"While it is true that the maritime lien is secret, hence is *stricti juris* and not to be extended by implication, this does not mean that the right to the lien is not to be recognized and upheld, when within accepted supporting principles, merely because the circumstances which call for its recognition are unusual or infrequent." Krauss Bros. Lumber Co. v. Dimon Steamship Corp., supra, 290 U.S. at p. 125, 54 S.Ct. 107, 78 L.Ed. 216.

The libelant's right to a lien did not arise upon the overpayment, nor even upon the billing:

"[U]pon the lading of the vessel, or at least when she is ready to receive the cargo—where there is 'union of ship and cargo' * * * the contract become[s] the contract of the vessel and the right to the lien attach[es]." Krauss, 290 U.S. at p. 121, 54 S.Ct. 106, 78 L.Ed. 216.

Once this right to a lien has attached, the subsequent ending of the union of ship and cargo does not end the right to a lien. That is the holding of the Krauss case.

Libelant is entitled to a final decree against the SS LUCIE SCHULTE in the sum of $4,288.86, together with

interest from the dates of the respective overpayments.

This opinion shall constitute the findings of fact and conclusions of law of the Court.

Submit decree in accordance herewith.