**UNITED STATES of America,**
**Libellant-Appellee,**

v.

**The S.S. LUCIE SCHULTE, her engines, boilers, etc. and Three Bays Lines, Inc., Respondents,**

**Schulte & Bruns, Claimant-Appellant.**

**No. 251, Docket 29110.**

United States Court of Appeals Second Circuit.

Argued Dec. 15, 1964.

Decided April 6, 1965.

---

Nicholas J. Healy and Nicholas J. Healy, Jr., New York City (Healy, Baillie & Burke, New York City), for appellant.

Robert V. Zener, Washington, D. C. (John W. Douglas, Asst. Atty. Gen., Robert M. Morgenthau, U. S. Atty., Morton Hollander, Washington, D. C., Attorney), for appellee.

Before FRIENDLY, HAYS and MARSHALL, Circuit Judges.

FRIENDLY, Circuit Judge.

This libel, tried on a stipulation of facts and exhibits before the late Judge Dawson, 227 F.Supp. 583 (1964), raises questions, seemingly not yet settled by authority, on the old subject of maritime liens.

On two occasions in 1957, Schulte & Bruns, a German partnership owning the Lucie Schulte, time-chartered her to Three Bays Corporation, Ltd. of Nassau, Bahamas. The charters on a standard form (designated "Government Form, approved by the New York Produce Exchange") contained a provision that

"Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners in the vessel."

On three occasions during the charter periods the United States, acting through the Navy's Military Sea Transportation Service and the Transportation Office, Patrick Air Force Base, made shipments on the Lucie Schulte from Port Canaveral, Florida, to installations in the British West Indies. The bills of lading, standard Government forms, designated the "transportation company" as "Three Bays Line (MS MV Lucie Schulte)," and were signed by an officer or agent of Three Bays Lines, Inc., apparently a branch of the charterer organized as a Florida corporation. Under a "conference tariff concurrence" filed with the Federal Maritime Board by Three Bays pursuant to 46 U.S.C. § 817, the charges on the Government's shipments were limited to those specified in the Leeward & Windward Islands & Guianas Conference Southbound Freight Tariff No. 6. Freight was demanded by Three Bays Lines, Inc., and paid by the Government at dates ranging from three weeks to four months after the respective deliveries. Although the vouchers certified "that the rates charged are not in excess of the lowest net rates available for the Government, based on tariffs effective at the date of service," the amounts paid exceeded such rates by $4,288.86. Some three and a half years later the Government brought this libel to recover that amount from the ship in rem and Three Bays Lines, Inc., in personam; the latter was not served and apparently is insolvent.

The alternative defenses relied on by the claimant-owner were that the overcharges had been made after cessation of the "union of ship and cargo," see Krauss Bros. Lumber Co. v. Dimon S.S. Corp., 290 U.S. 117, 121, 125, 54 S.Ct. 105, 78 L.Ed. 216 (1933), and that under the circumstances the "prohibition of lien" clause of the charter barred the Government's assertion of a lien for overpayments exacted by a time-charterer. Agreeing with Judge Dawson's rejection of the first defense, we think he was mistaken in overruling the second.

 (1) Supporting its first defense, the owner relies on policy arguments against maritime liens, summed up in the oft-quoted statement that the lien "is a secret one which may operate to the prejudice of general creditors and purchasers without notice and is therefore *stricti juris* and cannot be extended by construction, analogy or inference." Osaka Shosen Kaisha v. Pacific Export Lumber Co., 260 U.S. 490, 499, 43 S.Ct. 172, 174, 67 L.Ed. 364 (1923), paraphrasing The Yankee Blade, 19 How. 82, 89, 60 U.S. 82, 89, 15 L.Ed. 554 (1857). But neither such general considerations nor the decision in Pacific Export, applying to a portion of cargo not yet loaded the settled rule that a lien does not arise from an unjustified refusal to accept the goods for shipment, The Saturnus, 250 F. 407, 3 A.L.R. 1187 (2 Cir.), cert. denied, 247 U.S. 521, 38 S.Ct. 583, 62 L.Ed. 1247 (1918), see Gilmore & Black, Admiralty § 9–22 (1957), would support a distinction impossible to justify on any ground of logic or of policy. The Krauss Bros. case overrode an attempted distinction far more tenable than that asserted here—namely, between a refusal to deliver unless the excessive charges were paid, amounting to a threat of conversion, and a demand for such charges *simpliciter,* giving rise to liability in contract or quasi-contract. Once that barrier has been crossed, it would be altogether irrational to have the existence of a lien turn on whether the demand was made, or the payment received, while the goods were on the ship, on a pier in the ship's control, or later. That the high financial responsibility—or the complicated accounting procedures—of a particular shipper may induce or require the carrier to defer demand and payment is irrelevant to the recognition of a lien in favor of the shipper, the "vice" of which is as great when payment is made earlier as when made later.

 The loss of the carrier's possessory lien on the goods on the latters' delivery is similarly irrelevant. "Mutuality" is no more appealing in this branch of the law than elsewhere, see Cardozo, The Growth of the Law 14–16 (1924); Zdanok v. Glidden Co., 327 F.2d 944, 954–955 (2 Cir.), cert. denied, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964), and it would be unreasonable to spell out from the mere fact of delivery and receipt an agreement by the shipper to forego any lien to which it would be entitled in the absence of such a release. Indeed, Krauss Bros. itself sufficiently settles this point. Although that case was decided on the pleadings, which do not disclose whether payments were simultaneous with the various deliveries or a short time thereafter, 290 U.S. at 120, 54 S.Ct. 105, no one seemed to think anything turned on this, the important point pressed by the ship and rejected by the Supreme Court being that excessive payment was not demanded as a condition of delivery. See Judge L. Hand's analysis of the decision in Sword Line, Inc. v. United States, 228 F.2d 344, 346 (2 Cir. 1955), aff'd on rehearing, 230 F.2d 75 (2 Cir.), aff'd, 351 U.S. 976, 76 S.Ct. 1047, 100 L.Ed. 1493 (1956). Moreover, the Supreme Court's opinion approved, 290 U.S. at 124, 54 S.Ct. 105, Judge Hough's decision in The Oceano, 148 F. 131 (S.D.N.Y.1906), recognizing a lien for an overpayment by a charterer's agent, apparently made some days after the "union" of charter-party and vessel had ended. We thus cannot give the statement of Mr. Justice Stone, 290 U.S. at 125, 54 S.Ct. at 107—"the overpayment, made as the cargo was unloaded, occurred while the union of ship and cargo continued, and the liability assert-

ed was determined by events contemporaneous with that union"—enough weight to tilt the scales in the owner's favor; context suggests that the opinion was stressing factual similarity with prior cases and not fixing the outer limits of the lien. Only a paragraph later Mr. Justice Stone declared that "[i]t is only the obligations of ship and cargo under the contract of affreightment which are to be characterized as mutual and reciprocal, not the liens which result from the breach of those obligations." 290 U.S. at 125–126, 54 S.Ct. at 108.

■ (2) It is well settled that an owner who has entrusted his vessel to a charterer, whether on a time or a bare boat basis, cannot escape maritime liens for non-consensual transactions, such as tort claims of a sort that could not also be enforced in contract, and statutory penalties. The Barnstable, 181 U.S. 464, 467–468, 21 S.Ct. 684, 45 L.Ed. 954 (1901). But it had been held even earlier that it is "a just and reasonable implication of law that the general owner assents to the creation of liens binding upon his interest in the vessel, as security for the performance of contracts of affreightment made in the course of the lawful employment of the vessel." The Schooner Freeman v. Buckingham, 18 How. 182, 190, 59 U.S. 182, 190, 15 L.Ed. 341 (1856). Although this statement was made in a case where an owner had relinquished control to a proposed purchaser, there could be no sound reason for declining to apply the same principle to a charter, and decisions expressly have so applied it. The Euripides, 52 F. 161 (S.D.N.Y.1892), modified on other grounds, 71 F. 728 (2 Cir. 1896); see The Wilmington, 48 F. 566, 568 (D.Md. 1880); Price, Maritime Liens 146 (1940).

The serious questions are whether and, if so, how "the general owner" can effec-

tively negate the "just and reasonable implication" of assent. The Court limited its ruling in The Schooner Freeman to "a party who has no notice of any restriction upon that apparent authority" of the person in control of the ship to create liens upon her for the breach of maritime contracts whose violation by an owner would give rise to a lien; and the actual holding was that no lien existed where the "special owner" and his master fraudulently issued bills of lading for nonexistent goods, for such bills do not "grow out of any employment of the vessel." Most of the later cases as to chartered vessels deal with lien claims of materialmen. The Kate, 164 U.S. 458, 17 S.Ct. 135, 41 L.Ed. 512 (1896), and The Valencia, 165 U.S. 264, 17 S.Ct. 323, 41 L.Ed. 710 (1897), denied a lien where a materialman could readily have ascertained that the vessel was chartered and that the charterer had agreed to pay the expense in question. The Lien Act of 1910, § 3, 36 Stat. 605, 46 U.S.C. § 973, provided that materialmen's liens could be created by charterers, save "when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party" the person ordering the materials "was without authority to bind the vessel therefor." While the Lien Act broadened materialmen's liens, see The Oceana, 244 F. 80 (2 Cir.), cert. denied, 245 U.S. 656, 38 S.Ct. 13, 62 L.Ed. 533 (1917), most importantly by overruling the "home port" doctrine of The General Smith, 4 Wheat. 438, 17 U.S. 438, 4 L.Ed. 609 (1819), it thus codified The Kate and The Valencia insofar as these cases held that no such lien would be recognized when the owner had limited the charterer's authority and the would-be lienor should have learned of this.[1]

■ The prohibition of lien clause in the instant charters was adequate to

1. A possible analogy is afforded by cases where the charterer violates the charter-party and the shipowner seeks a lien on the freight money owed to the charterer by a shipper and often still secured by the cargo. The cases suggest that if the shipper can be charged with notice of

a charter provision giving the shipowner "a lien upon all cargoes and all subfreight for charter money due," a lien will attach. See American Steel Barge Co. v. Chesapeake & O. Coal Agency Co., 115 F. 669 (1 Cir. 1902); Gilmore & Black, supra, § 9–20, at 517 n. 103.

defeat lien claims of a materialman who could have ascertained its existence by reasonable diligence. United States v. Carver, 260 U.S. 482, 43 S.Ct. 181, 67 L. Ed. 361 (1923). Although the prime purpose of the clause may have been to trigger the pertinent provision of the Lien Act, we perceive no tenable ground for narrowing the broad language to materialmen's liens. Neither do we see any basis, either in policy or in authority, why an owner should be forbidden to protect himself against the creation of liens by a charterer under contracts of affreightment if he sufficiently brings the charterer's lack of authority home to the shipper. Legislation safeguarding shippers does not reach this case; [2] equally irrelevant are the cases, exemplifying admiralty's solicitude for seamen, which preserved the *in rem* action for maintenance and cure and for wages despite the terms of a charter, e. g., The Edward Peirce, 28 F.Supp. 637 (S.D.N.Y.1939); The General J. A. Dumont, 158 F. 312 (E.D.Va.1907). It follows that if the United States had known that the Lucie Schulte was under charter and had seen the charter-parties, it would have no lien. We see no adequate reason for not reaching the same result in a case where the shipper could have ascertained the facts by exercise of reasonable diligence—a rule which, without statutory directive, The Kate and The Valencia had applied to the equally worthy materialman. It is true, as the Government suggests, that many shippers could not fairly be charged under this principle, e. g., a tourist who had ordered goods and neither knew nor cared on what vessel they would be shipped, but this goes to the factual question of what diligence reasonable under the circumstances would have disclosed and not to the legal principle. We are dealing in this case with a shipper in large volume and of extraordinary sophistication. There is nothing to suggest that if the Government knew the Lucie Schulte was chartered, there would have been the slightest difficulty in its ascertaining before the shipments were made whether the charter contained a "prohibition of lien" clause. So the case comes down to the narrow issue whether the Government has borne the burden of showing that the exercise of reasonable diligence would not have informed it that the goods were to be transported on a chartered vessel. We think it has not; since it elected to submit the case on a meagre stipulation, it should take the consequences rather than have us put the owner to the further expense of a remand.[3]

Reversed, with instructions to dismiss the libel *in rem*.

2. Gilmore & Black, supra, § 4–24, contend that a "prohibition of lien" clause, even in a bareboat charter, cannot overcome the Congressional policy that regardless of contract the vessel be charged with cargo damage caused by fault, see Carriage of Goods by Sea Act, §§ 3(8), 5, 46 U.S.C. §§ 1303(8), 1305. Where COGSA applies, however, its special protection is balanced by such restrictions as the one-year statute of limitations fixed by § 3(6), 46 U.S.C. § 1303.

3. Under the principle of laches, well established in admiralty lien cases, The Key City, 14 Wall. 653, 660, 81 U.S. 653, 660, 20 L.Ed. 896 (1871), it would seem to follow that a person asserting a maritime lien on a chartered vessel is obliged to move promptly, so that the owner may effectively pursue his rights of indemnification against the charterer. See Murphy v. International Freighting Corp., 182 F.Supp. 636, 640 (D.Mass.), aff'd per curiam, 283 F.2d 392 (1 Cir. 1960); United Fruit Co. v. The M. D. Whiteman, 125 F.Supp. 898 (E.D.La.1954). However, Schulte & Bruns does not charge any lack of diligence and, for this reason as well as the ground taken in the opinion, we are not required to consider the principle's application to the facts or its availability against the sovereign, see The Falcon, 19 F.2d 1009 (D.Md.1927); United States v. Baltimore Towing Co., 144 F.Supp. 854, 855 (D.Md. 1956).