Donald C. HARRIS, Emily Rose, Barbara Ann Bagley, John R. Zacheus, Ronald W. Trlica, Marilyn Potter, Peter G. King, Ronald Lee Rakestraw, Ralph G. Sheehan, Pat Kasprowicz and Donna Dyer Zumwinkle, Plaintiffs,

v.

WAIKANE CORPORATION, a Hawaii Corporation, dba Hawaiiana Yacht Charters, Defendant.

WAIKANE CORPORATION, a Hawaii Corporation, dba Hawaiiana Yacht Charters, Third-Party Plaintiff,

v.

William E. ADOLPH, Third-Party Defendant.

Civ. No. 76–0159.

United States District Court, D. Hawaii.

Jan. 8, 1980.

Ronald S. Adelman, John R. Dwyer, Jr., Carlsmith & Dwyer, Honolulu, Hawaii, for plaintiffs.

Robert M. Rothwell, Honolulu, Hawaii, for defendant & third-party plaintiff.

Edwin A. Ebisui, Jr., and Peter Q. Ezzell, Wahiawa, Hawaii, Haight, Dickson, Brown & Bonesteel, Los Angeles, Cal., for third-party defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SAMUEL P. KING, Chief Judge.

This case revolves around the Astor, a beautiful eighty-three foot staysail schooner built in 1926 in Scotland by the famous shipbuilder and designer Donald Fyfe. The Astor was raced for many years, and eventually purchased by third-party defendant Dr. William E. Adolph in 1965. When Dr. Adolph originally sailed the schooner to California, he was cited by the Coast Guard for not reporting the arrival of a foreign vessel in a United States port, 19 U.S.C. § 1433 (1976), and not entering such a vessel in customs, 19 U.S.C. § 1435 (1976). In 1970 he was cited for transporting passengers between ports in the United States on a foreign vessel, 46 U.S.C. § 289 (1976). After extensive negotiations between his attorneys and the government, Dr. Adolph settled these claims by paying a portion of the assessed fines.

In 1973, one of Dr. Adolph's sons died in an accident involving the Astor, and Dr. Adolph decided he wanted nothing further to do with the schooner. In the fall of 1974, Herbert Katz talked to Dr. Adolph, and

identified himself as a friend of the doctor's late son. Katz told Dr. Adolph that his son would have wanted a beautiful ship like the Astor to be sailed, not left unattended. Katz said he was an excellent sailor and would be happy to live on the Astor and see to some minor repairs. Dr. Adolph told Katz that what he really wanted to do was sell the Astor, and Katz indicated he could help sell the ship. Dr. Adolph decided to let Katz live on and sail the Astor while they both tried to sell her. Katz and Dr. Adolph discussed the possibility of chartering the ship, but nothing specific was agreed upon because Dr. Adolph was wary of incurring new fines. After Katz moved on board, the Astor needed some repairs and was dry-docked for a short while in California. The vessel later needed further repairs, and Katz told Dr. Adolph that there was a free berth for the Astor at the University of Hawaii. Katz also told Dr. Adolph that the Astor could be repaired more cheaply in Hawaii than California, and also could be sold more easily there. Katz said he would take some friends with him to Hawaii to help defray expenses. Dr. Adolph agreed to the plan.

■ Katz, in actuality, got together a group of passengers who were willing to pay for sailing to Hawaii. Katz had these passengers execute a supposed "bareboat charter" agreement,[1] as well as an agreement electing Katz captain and ship's hus-

band for the voyage. These maneuvers were to get around 46 U.S.C. § 289 (1976) which forbids foreign vessels from carrying passengers between United States ports.[2] The bareboat charter in this case was a sham. Passengers came to Katz separately and agreed to pay to sail to Hawaii. There were also crew members who did not pay or who paid a lesser amount. The bareboat charter form the passengers signed indicated the contract was between them and the owner, Dr. Adolph. The contract was not signed by either Dr. Adolph or anyone acting as his agent. According to the contract Dr. Adolph was to receive three hundred dollars. He received nothing.

The Astor was sailed to Honolulu via Lahaina, Maui. After the voyage, one of the passengers wrote Dr. Adolph a letter, telling him that Katz was a terrible seaman and an irresponsible master. He stated that Katz was allowing the Astor to deteriorate very rapidly. The passenger indicated that he would be willing to repair the Astor at his own expense, if only Katz was gotten off the boat. In December 1975, Dr. Adolph received a call from the Coast Guard in Honolulu. They advised him that the Astor had again violated 19 U.S.C. §§ 1433 & 1435 (1976), and 46 U.S.C. § 289 (1976). The Coast Guard told Dr. Adolph that fines would be assessed and that the Astor might be seized for these violations.

1. A bareboat or demise charter is one in which the charterer becomes the owner *pro hac vice* of the vessel. He obtains sole possession and has full control of the vessel, including control over command and navigation. For discussions of bareboat or demise charters, *see Guzman v. Pichirilo*, 369 U.S. 698, 699 (1962); *Schnell v. United States*, 166 F.2d 479 (2d Cir. 1948); *Klishewich v. Mediterranean Agencies, Inc.*, 302 F.Supp. 712, 713 (E.D.N.Y.1969). If a charter is not a bareboat charter, it may be a voyage charter, whereby the charterer engages the ship and crew for a single voyage, or a time charter, whereby the charterer rents the carrying capability of the ship (which is still under the control of the owner and his crew) for a set period of time. Chartering a ship with a crew is not necessarily fatal to the charter being viewed as a demise, but it is one factor that is considered in determining how much control was surrendered by the owner. Whether the charter is viewed as a demise or not greatly

affects the rights and liabilities of the owner and the charterer. Usually courts strain to find that charters are not demise charters, *see United States v. Shea*, 152 U.S. 178, 14 S.Ct. 519, 38 L.Ed. 403 (1894); *Aird v. Weyerhaeuser S. S. Co.*, 169 F.2d 606 (3d Cir. 1948), though the rule is somewhat different if a personal injury action is brought against the alleged demise charterer as owner *pro hac vice*.

2. If the voyage is viewed as a true bareboat charter, there is no violation of the statute, for the charterers are viewed as temporary owners of the boat, not as passengers. If the charter is viewed as anything other than a demise, there is a violation of the statute if the vessel goes from one port in the United States to another. There is no doubt that the voyage from California to Hawaii was not a bareboat charter, and as will be seen, the Coast Guard did not view it as such.

At this point, Dr. Adolph called Katz in Hawaii and told him to leave the Astor. Katz pleaded that he and his little dog be allowed to stay on board as they had nowhere else to go. Dr. Adolph agreed that Katz could temporarily remain on board the Astor, but told him he could not sail her.

In January 1976 the Coast Guard constructively seized the Astor. This meant that the Astor could still be sailed, but she had to remain within fifty miles of Hawaii. Later in January, without any authority from Dr. Adolph, and contrary to his explicit instructions not to sail the Astor, Katz entered into a "Charter Management Agreement" with Hawaiiana Yacht Charters, a division of the defendant, Waikane Corporation. The agreement purported to be between Waikane and the owner of the Astor, but was signed only by Katz as captain. The agreement allowed Waikane, as agent for the owner, to arrange "bareboat" charters for the Astor. Waikane was to make all the arrangements, as well as advertise the availability of the Astor for charter. It was to receive a certain amount of money for every day the Astor was chartered.

In February 1976, Dr. Adolph's son Aric wrote Katz telling him to respond to the Coast Guard's charges. He warned of the severe fines and protracted legal battles that would result from using the Astor for other than bareboat charters. This particular letter does not seem to agree with Dr. Adolph's recollection of his December conversation with Katz, in which he told Katz not to sail the Astor at all. The Court finds, nevertheless, that in December Dr. Adolph did order Katz not to sail the Astor. Later in February, Aric Adolph sent Katz a mailgram, signed and authorized by Dr. Adolph, which stated: "Do Not Sail Schooner Astor Pressing Legal Reasons Wait Until Further Notice."[3]

Leaving Hawaii and the trials and tribulations of Katz and the Adolph family for the moment, we move to Colorado. There, plaintiff Donald Harris and a number of his friends were planning their vacation. They wanted to go on a sailing cruise, and were considering both the Carribean and Hawaii. One of Harris's friends had previously lived in Hawaii and convinced the group that Hawaii was paradise. In early March, Harris telephoned Waikane in Honolulu and spoke to Bob Prosser, the business manager. Harris indicated that he was interested in chartering a yacht for a group of about eight friends for a period of about ten days. Prosser said there were some ships available and promised he would send Harris some literature. He sent a letter indicating that three yachts, including the Astor, might be available, and invited Harris to reserve a yacht or contact him further. Harris called Prosser back, and said his group definitely wanted the Astor. Harris sent a deposit of two hundred dollars, and Waikane sent back a letter and receipt indicating that the balance due in Hawaii was twenty-eight hundred dollars, and that the Astor was reserved for a ten-day period beginning April 19, 1976. A description of the Astor was sent out with the confirmation and receipt.

> She is sailed by a professional crew and charterers are urged to join in the sailing of her or just go with their 'feet on the rail' as they choose. Either way, she is the most beautiful and enjoyable vessel in Hawaii. She comfortably sleeps 15 charterers in five double bunks and five singles.

Harris had always known that a number of his friends would go with him to Hawaii. Some were in on the trip from the beginning, and some finalized their arrangements about two weeks before the trip—after the contract with Waikane had been made. The plaintiffs intended to share equally in

---

**3.** Plaintiffs contend that this mailgram was somehow ambiguous. They claim that the words "Pressing Legal Reasons" somehow make the meaning of the message unclear. They do not indicate exactly why this makes the meaning unclear, and the Court finds that the meaning was perfectly clear. Katz was not to sail the Astor. The clarity of the message is not particularly important in view of the Court's determination that Dr. Adolph told Katz the same thing in December.

the expenses of the cruise. Harris and the other ten set aside vacation time for their Hawaii trip. Most of the plaintiffs were planning on spending several days in Honolulu prior to the charter, and a week or so on Maui after the charter. While on the Astor they planned to sail around the islands, ending up in Lahaina, Maui.

While all this was going on, Dr. Adolph finally decided to get Katz off the yacht. He had come to an agreement with the man who had written him the letter about Katz and the Astor, and they had reserved dry-dock space for the end of April. On April 15, 1976, Aric Adolph, armed with an authorizing letter from his father, evicted Katz from the Astor. Katz then called Waikane and informed them what had happened. By this time plaintiffs had arrived, *en masse*, in Honolulu, and decided to visit Waikane on the 15th to see how things were progressing. When they arrived, they were told the Astor was not available. Needless to say, they were extremely disheartened. During the next day or so, plaintiffs discussed with Waikane the possibility of their chartering other yachts. Waikane offered the plaintiffs a twenty foot boat and a forty foot boat for the original three thousand dollars, or a forty foot boat and a fifty-five foot boat for five hundred dollars more. The plaintiffs, because they did not want to break up their group, declined the offers. Harris did indicate that they might be willing to take the two larger boats for the original contract price, but Waikane said no. In his deposition, Harris stated that he did not contact any other yacht brokers or charterers in Honolulu.

Plaintiffs decided that they would go to Kauai for part of the time they would have been sailing. They stayed there for about four days and then went on to Maui several days earlier than originally planned. Plaintiffs suffered a great deal of inconvenience and distress. Their dream sailing vacation had turned into a mess. They were short of money because they had twenty-eight hundred dollars tied up in a certified check made out to Waikane, couples were forced to share rooms on Kauai, and some of the plaintiffs could not afford to participate in certain recreational activities. In general the plaintiffs were very disappointed, and that disappointment lasted throughout the vacation. They spent a good deal of money during the ten days they should have been sailing, and had they known from the outset that the Astor was not going to be available, they would have gone elsewhere for their sailing vacation.

Within a day after Aric Adolph boarded the Astor, both Prosser and Katz (perhaps together) called Dr. Adolph and informed him of the Harris charter. Dr. Adolph told them he did not care, and that he would never let Katz back on the Astor. On April 11, 1976 Katz had written to Dr. Adolph describing how he and his dog "Poopsie" were looking after the Astor. He never mentioned that he had signed a contract with Waikane or that he was taking the boat out for charters. In fact, he indicated that he was taking jobs on other boats in order to make ends meet.

In late April 1976, plaintiffs filed this lawsuit. They originally sued only Waikane, charging the defendant with breaching the charter contract. Waikane filed a third-party complaint against Dr. Adolph asking for indemnification, after which the plaintiffs filed a complaint against Dr. Adolph for breach of contract and intentional infliction of emotional distress. In August 1978, this Court granted Dr. Adolph summary judgment as to the claims of Waikane, and partial summary judgment as to plaintiffs' claims for punitive damages.[4] The case was tried before the Court without a jury in May 1979.

## PLAINTIFFS' CLAIM AGAINST WAIKANE

### A. *Jurisdiction*

█ This Court has jurisdiction in admiralty, 28 U.S.C. § 1333 (1976), to determine

---

4. Waikane did not oppose the motion for summary judgment, and has filed no papers in this case since September 1977. The Court has been advised that Waikane is insolvent.

plaintiffs' claims against defendant Waikane. Plaintiffs' contention is that Waikane contracted with them to charter the Astor.[5] Contracts to charter vessels, whether for personal or commercial use, have always been viewed as maritime in nature. *See, e. g., Morewood v. Enequist*, 64 U.S. (23 How.) 491, 16 L.Ed. 516 (1859); *Armour & Co. v. Fort Morgan S.S. Co.*, 270 U.S. 253, 46 S.Ct. 212, 70 L.Ed. 571 (1926); 7A Moore's Federal Practice ¶ .245[1] at 2973. The problem in this case is that only Harris actually contracted with Waikane. The other plaintiffs did not take part in the negotiations, and they were not parties to the charter. All correspondence from Waikane was addressed to Harris, and the deposit check was Harris's personal check.

■ Delving somewhat into the merits, it is clear to the Court that the plaintiffs other than Harris cannot recover as parties to the charter contract. If they are to recover at all, it must be as third-party beneficiaries of that contract. As will become clear later in the opinion, the Court does view these plaintiffs as third-party beneficiaries, and so the Court does have jurisdiction to consider their claims. As Moore states:

> Once it is concluded that a third party is in fact the *intended* beneficiary of a contract entered into between two or more other parties and is not merely incidentally or unintentionally benefited thereby, it appears necessarily to follow that if the subject matter of the contract is maritime the rights of the third party must be cognizable within the admiralty. And this appears to be the way the maritime law is developing. Any other result would be illogical.

7A Moore's Federal Practice ¶ .295 at 3301–02. There are many cases that recognize in admiralty the claims of third-party beneficiaries of maritime contracts. *See, e. g., Waterman Steamship Corp. v. Dugan & McNamara, Inc.*, 364 U.S. 421, 81 S.Ct. 200, 5 L.Ed.2d 169 (1960); *Crumady v. The Joa-*

chim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959); *Drago v. A/S Inger*, 305 F.2d 139 (2d Cir. 1962).

**B. Existence of a Contract**

■ There is no doubt that a contract existed between Waikane and Harris. After negotiating with Waikane on the telephone, Harris sent a deposit. Waikane sent Harris a confirmation letter and a receipt. Both documents confirmed the charter of a particular vessel, for a particular period of time, at a specified rate. It is not necessary for the Court to determine the exact instant in time the contract became a living, breathing entity. Plaintiffs contend the contract was formed during a phone conversation between Harris and Prosser, but it is irrelevant to the issues of this case whether or not that is so.

**C. Plaintiffs as Third-Party Beneficiaries**

■ The Court must determine the status of the plaintiffs other than Harris— those who were not parties to the charter contract. During his original phone conversation with Waikane, Harris mentioned that there would probably be a total of eight in his party. The original letter that was mailed out by Waikane mentioned "your 10 day, 8 persons charter." There is no indication, however, that the parties agreed that only eight would be in the charter party. The confirmation and receipt sent by Waikane did not mention a specific number of persons—it stated only that the Astor had been chartered for a particular period. At the time the contract was made, the identities of all those who were to accompany Harris were not yet ascertained. This does not, however, preclude the plaintiffs who did eventually accompany Harris from recovering as third-party beneficiaries.

During his negotiations with Waikane, Harris indicated that he and a group of friends were planning a vacation. Harris said he was acting as spokesman for the group, and he told Waikane that the char-

---

**5.** Plaintiffs have sued Waikane as a principal. They also have a cause of action for breach of Waikane's implied warranty that it had the authority to charter the Astor. *See* the discussion in note 11 *infra*.

ter was to be for the benefit of the group. Restatement (Second) of Contracts § 133 (Tent. Draft No. 3, 1967) states:

(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if (a) the performance of the promise will satisfy a duty of the promisee to the beneficiary; or (b) the promisee manifests an intention to give the beneficiary the benefit of the promised performance and recognition of right to performance in the beneficiary is appropriate to effectuate the intention of the parties.

In this case, the plaintiffs other than Harris were beneficiaries of the promise. They were to be on the Astor and receiving the benefits of the charter for the entire ten-day period. As far as subsection (a) is concerned, performance by Waikane, the promisor, would satisfy a duty owed by Harris, the promisee, to the other plaintiffs. They all contributed to the deposit that Harris sent, and they all contributed to the certified check for twenty-eight hundred dollars. As to subsection (b), Harris clearly intended that all the plaintiffs would receive the benefits of the charter. In addition, recognizing the other plaintiffs' right to performance is appropriate to effectuate the intention of the parties. Harris intended to benefit the other plaintiffs, and Waikane was certainly aware that those other plaintiffs would be benefited.

In *Crumady v. The Joachim Hendrik Fisser*, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959), the Supreme Court had to determine whether the owner of a vessel could recover indemnification from a stevedoring company for breach of warranty of workmanlike service, when the stevedoring company's only contract was with a time charterer. The Court stated:

The warranty which a stevedore owes when he goes aboard a vessel to perform

services is plainly for the benefit of the vessel whether the vessel's owners are parties to the contract or not. That is enough to bring the vessel into the zone of modern law that recognizes rights in third party beneficiaries.

358 U.S. at 428, 79 S.Ct. at 448.[6] Similarly, in this case, the performance owed by Waikane was clearly for the benefit of a group of people, not just Harris, and Waikane understood this when it made the contract.

■ There are two remaining problems. There was no definite group of people contemplated as beneficiaries when the contract was made, and the number in the charter party was understood by Waikane to be eight, not eleven. The first problem is not difficult. If two parties to a contract intend to benefit a group or class of people, and intend performance to run to that group or class, that is all that is required for that group to attain the status of third-party beneficiaries. The promisor is not prejudiced because the blanks, as it were, are filled in later.

The real problem is that Waikane was expecting eight—and eleven showed up. It would definitely be unfair to allow all eleven full contract recovery when the defendant, at the time of contracting, contemplated only eight passengers. It would also be unfair to allow only Harris to recover, and it would be ludicrous for the Court to pick seven lucky plaintiffs. The simple solution is to take the expectations of the defendant regarding the number of passengers into account when damages are determined. As will be discussed later, figuring damages in a case such as this is far from an exact science anyway, and reducing individual recoveries by a fraction does not complicate matters, nor does it ruin some perfect method of damage computation.[7]

6. *See also Waterman Steamship Corp. v. Dugan & McNamara*, 364 U.S. 421, 81 S.Ct. 200, 5 L.Ed.2d 169 (1960) (owner, though not a party to contract, is clearly the beneficiary of stevedore's warranty of workmanlike service); *Di Paola v. International Terminal Operating Co.*, 294 F.Supp. 736 (S.D.N.Y.1968), *remanded on other grounds*, 418 F.2d 906 (2d Cir. 1969)

("Lack of privity is not necessarily a bar to suits by all non-parties to maritime contracts.").

7. Other cases down the road may be more difficult. If, for example, a group of ten beneficiaries was contemplated by the promisor, and fifty came into court, the solution worked out

### D. *Breach*

 Waikane promised the plaintiffs that the Astor would be available for charter during the time specified in the receipt and confirmation letter. Waikane was unable to provide the Astor and hence breached the contract. It is true that the owner's acts prevented Waikane from performing, but these acts in no way excused Waikane's performance under the guise of impossibility. Performance of a contract is excused only when because of an unforeseeable occurrence performance becomes impossible, and the risk of that occurrence had not been allocated by the parties. In this case, the heart of the contract was the furnishing of the Astor by Waikane. In making the contract they warranted that they would be able to provide the yacht. They did not tell Harris that they were really only an agent for the owner—they unqualifiedly said they could deliver. If a person contracts to sell his car, and the car is repossessed, that person is not excused from performing through the doctrine of impossibility. The situation might be different if through no fault of the promisor the subject matter of the contract were destroyed, but that was not the case here. Waikane could have made sure the owner would not take back the Astor—it could have contacted the owner before it made the contract. For impossibility to be a viable excuse, that impossibility must usually be objective, such that the contract cannot be performed by anyone. The contingency that occurred here affected only Waikane, not charterers in general, and it was not wholly unforeseeable. Waikane's breach was not excused.

### E. *Damages*

Determining plaintiff's damages in this case is a difficult task. There are so many factors to be considered that there is no number the Court can point to with certainty and say: "That's it." The job of the Court is to balance all the relevant factors and pick a damage figure it believes is fair.

 The first consideration is whether plaintiffs are barred from recovering because they failed to mitigate damages. Plaintiffs refused Waikane's offers of other yachts. This refusal was justified, however. The Astor was a unique vessel, as all parties agree, and the other yachts offered to plaintiff were not of the same caliber. Also, plaintiffs were not required to split their group in two. It is true that Waikane only expected eight passengers, but (1) none of the four vessels offered would accommodate eight persons nearly as comfortably as the Astor, (2) while eight was the number discussed, the Astor was represented as sleeping fifteen, and (3) the contract did not specify a particular number—only a particular vessel.

Also, as regards mitigation, Harris testified in his deposition that he did not contact other yacht brokers in Hawaii. This failure to determine if "cover" was possible does not bar plaintiffs from recovering. In the first place, as mentioned, the Astor was a unique vessel that could not be matched by other yachts. In addition, there was no evidence introduced regarding the availability of other vessels. Normally, when an injured party fails to cover, his damages are limited to those he would have incurred had he covered. In that situation, it is of course up to the defendant to prove what those lesser damages would have been. No such proof was introduced in this case. Nevertheless, the Court does view plaintiffs' failure to investigate as one indication of the value *they* put on going sailing for ten days.

Were this a case where the charter was to have started from some barren wilderness,

by this Court might not be appropriate. In such a case a court might not allow recovery by anyone. This Court is not saying that any time some nebulous group of beneficiaries is contemplated, a right to recover for breach of contract is established. Rather, in this particular case, the Court finds that in the interests of justice, and in order to best implement the intentions of the parties, the plaintiffs should be able to recover. This is not a commercial situation where the promisee was negotiating on behalf of an unknown or unascertained group of clients. This is a case where an individual was acting on behalf of a group of friends.

damages would be easier to determine. Plaintiffs would have flown to where the charter was to have started; found out there was no charter, and flown home. Airfare would clearly be recoverable. In this case, plaintiffs did not fly home—they stayed in Hawaii for their vacation. The Court is, in essence, forced to weigh the enjoyment the plaintiffs would have had sailing on the Astor, against the enjoyment they did have on Oahu, Kauai, and Maui. Their airfare was not totally wasted, for they did have a vacation. The extra money they spent during the ten-day period was not wasted—it was spent on a vacation. The damage suffered is not speculative—the vacation plaintiffs had was not as enjoyable as that which they contracted for—but neither is it capable of easy or exact ascertainment.

Plaintiffs claim that they suffered a good deal of mental distress because of overcrowding on Kauai, and also because of general disappointment. Damage for this type of injury is recoverable, as it was clearly foreseeable when the contract was made that if the Astor was not delivered, plaintiffs might well suffer mental distress. There are other factors the Court must consider in arriving at a damage figure. As discussed, Waikane expected only eight persons, not eleven. In terms of consequential damages this is obviously important, as the key question is what was foreseeable at the time the contract was entered into? Another important factor is the total contract price—three thousand dollars. This figure helps the Court value the charter as a whole. The amount the plaintiffs were paying for the charter clearly bears some relation to the value *they* put on it.

One final factor is that the plaintiffs might have accepted Waikane's offer of the two substitute yachts (the larger two) had the price been the original three thousand dollars instead of thirty-five hundred. This is not determinative, for as discussed earlier

the plaintiffs were under no obligation to take the two boats. However, this is another indication of the value the plaintiffs placed on having the Astor as opposed to other yachts.

All these factors are relevant. The Court is not going to pretend to logically fit them all together into a completed jigsaw puzzle that spells out a particular dollar figure. Such precision is impossible in most cases, but is especially difficult here given the ethereal, yet real, nature of some of the items of damage. The Court finds for plaintiff Harris in the amount of eight hundred dollars, and for the remaining ten plaintiffs in the amount of four hundred dollars each. Plaintiffs are awarded their costs.

## PLAINTIFFS' CLAIMS AGAINST DR. ADOLPH

### A. *Jurisdiction*

Plaintiffs are also suing Dr. Adolph for breach of contract. In their pretrial statement, the plaintiffs indicate that their theory of the case is that they were third-party beneficiaries of the contract entered into between Katz, as agent for Dr. Adolph, and Waikane. This claim is not within the Court's admiralty jurisdiction. The rule (as illogical as it may be) is that while actual disputes involving charter contracts, whether executory or not, are within admiralty jurisdiction, disputes involving preliminary contracts to make vessels available for charter are not.[8] The agreement between Waikane and Katz is entitled: "CHARTER MANAGEMENT AGREEMENT", and provides that the *owner* hires Waikane as his agent to arrange bareboat charters. As there is no actual charter between the owner and Waikane, the charter management agreement simply creates an agency relationship. Any suit for breach of this agreement, whether by

8. *See, e. g., Minturn v. Maynard*, 58 U.S. (17 How.) 477, 15 L.Ed. 235 (1854); *Christman v. Maristella Compania Naviera*, 349 F.Supp. 845, 848 (S.D.N.Y.1971), *aff'd*, 468 F.2d 620 (2d Cir. 1972); *Christman v. Maristella Compania Navi-* era, 293 F.Supp. 442 (S.D.N.Y.1968) (third-party action by owner against broker for acting in excess of his authority in negotiating charter not cognizable within admiralty.)

Harris or Waikane, is not within the admiralty jurisdiction of the Court.[9]

■ There is, however, another theory upon which plaintiffs may proceed against Dr. Adolph, and that is by suing him as a principal to the original charter contract.[10] If Waikane acted for Dr. Adolph in arranging the charter, then Dr. Adolph's actions were a breach of the charter contract reached between Harris on the one hand, and Waikane, as Dr. Adolph's agent, on the other. The resolution of this claim in fact turns on whether Waikane *was* Dr. Adolph's agent, but the claim itself is based on the charter contract, and hence within the admiralty jurisdiction of the Court. Plaintiffs have not really put their finger on this theory, but the Court, in its discretion, will nevertheless consider it.[11]

## B. *Choice of Law*

The claim against Dr. Adolph turns on whether Katz had authority to bind Dr. Adolph to the charter management agreement, thereby giving Waikane the power to

**9.** Regardless of the jurisdictional issue, plaintiffs would be hard pressed to proceed under a third-party beneficiary theory. When the original charter management agreement was signed, Waikane had never even heard of plaintiffs, much less considered them as beneficiaries of the contract. The later agreement by Katz to furnish the Astor for the Harris charter was not even a contract between Katz and Waikane. It was, in essence, an acknowledgement of the contract made between Waikane (acting pursuant to the authority given it by the charter management agreement) and Harris for the charter of the Astor. Since this acknowledgement was not a contract, there can be no third-party beneficiaries.

**10.** Paragraph 25 of the amended complaint states:

> Plaintiff is advised and informed and thereon alleges that Third-Party Defendant WILLIAM E. ADOLPH with a callous, malicious and wanton disregard for the Plaintiffs' welfare and emotional well-being and their rights under the charter party agreement entered into between Plaintiffs and Defendant WAIKANE CORPORATION, as agent for Third-Party Defendant WILLIAM E. ADOLPH, refused to deliver or make the schooner "Astor" available to the Plaintiffs.

This essentially states the claim that Waikane entered into the charter contract, *inter alia*, as agent for Dr. Adolph. In addition to this, in their "Memorandum in Opposition to Motion to Dismiss," plaintiffs use the *Christman* case (*See* note 8 *supra*) in support of their jurisdictional position. Dr. Adolph in a prior memorandum had also used the *Christman* case. *Christman* was similar to this case, except the plaintiff there first sued the owner for breach of contract, and the owner sued the broker for breach of their agency contract. The court held that the suit against the owner was within admiralty jurisdiction, but that the suit by the owner against the broker was not. *Christman* does in fact support Dr. Adolph with respect to the third-party beneficiary theory propounded by the plaintiffs in their pretrial statement, but their use of the case can be viewed as an advancement of the direct breach of contract theory. In any case, Dr. Adolph was on notice that the real issue in the case was the validity of the contract between Katz and Waikane, and both sides vigorously contested the point. There is no prejudice to Dr. Adolph in the Court's considering the direct breach of contract theory.

**11.** It may on the surface seem incongruous that the Court is considering theories under which both Waikane and Dr. Adolph can be viewed as principals to the charter contract. However, in Waikane's dealings with Harris, it never indicated that it was making the contract on behalf of the owner of the Astor. All the literature indicated that Waikane was the principal. This of course does not prevent the plaintiffs from proceeding on the contract against the undisclosed principal, Dr. Adolph, who is also liable if the charter management agreement was valid. There is no doubt that if Katz had the authority from Dr. Adolph to execute the charter management agreement, Waikane, in arranging the Harris charter, was acting as the agent of Dr. Adolph. Restatement (Second) of Agency § 186 (1958) states: "An undisclosed principal is bound by contracts and conveyances made on his account by an agent acting within his authority . . . ." *See also Barnes v. De Fries*, 24 Haw. 401 (1918).

Even had Waikane disclosed that it was acting only as an agent (thus making Waikane not liable as a principal), it would still be liable under a breach of implied warranty of authority theory. In *Cargo Ships El Yam v. Stearns & Foster Co.*, 149 F.Supp. 744 (S.D.N.Y.1955) an agent for a charterer was sued as a principal to the charter contract. The court determined that only a case of breach of warranty of authority had been made out, but nonetheless awarded damages based on that theory, notwithstanding the fact it had not been pleaded. There would be jurisdiction in admiralty to consider a claim of breach of warranty of authority because the underlying contract for the charter of the Astor is maritime in nature. *See Christman v. Maristella Compania Naviera*, 293 F.Supp. 442, 443 (S.D.N.Y.1968).

bind Dr. Adolph to the charter contract with Harris. There is no clear answer as to whether this agency question is to be determined according to general maritime law or Hawaii agency law. In *Chelentis v. Luckenbach*, 247 U.S. 372, 38 S.Ct. 501, 62 L.Ed. 1171 (1918), the Supreme Court indicated that even "saving to suitors" clause cases in the common law courts [12] were to be governed by general maritime principles. The law has hardly followed a straight or true path since then, and many cases do not even deal with the problem of choice of law. In *Caldarola v. Eckert*, 332 U.S. 155, 67 S.Ct. 1569, 91 L.Ed.2d 1968 (1947), a case involving a question of agency law, the Supreme Court seemed to view state law as applicable. In *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959), the Court indicated that *Caldarola* was not to be read as limiting *Chelentis* in any way. Generally *Chelentis* has been followed, though when a state interest has been viewed as very important, and a maritime interest as not particularly compelling, state law has been looked to. *See, e. g., Fireman's Fund American Ins. Co. v. Boston Harbor Marina, Inc.*, 406 F.2d 917 (1st Cir. 1969); *Alcoa S. S. Co. v. Charles Ferran & Co.*, 383 F.2d 46 (5th Cir. 1967), *cert. denied*, 393 U.S. 836, 89 S.Ct. 111, 21 L.Ed.2d 107 (1968); *Avondale Shipyards v. The Thomas E. Cuffe*, 434 F.Supp. 920 (E.D.La.1977); *Jig the Third Corp. v. Puritan Marine Ins. Underwriters Corp.*, 519 F.2d 171, 174 (5th Cir. 1975).

In this case, though the charter contract is maritime, the charter management contract is not. Though plaintiffs are suing for breach of the charter contract, at issue is the validity of the non-maritime charter management contract. Were there a conflict between general maritime law and the law of Hawaii as to Katz's authority to enter into the charter management agreement, the Court would look to the law of Hawaii. Here, both maritime law and Hawaii law appear to follow general agency principles.

### C. *Actual Authority*

 Plaintiffs first claim that Katz had actual authority to enter into the charter management contract. As discussed in the first part of this opinion, the Court finds that in December 1975, Dr. Adolph forbid Katz from even sailing the yacht, much less entering into a charter arrangement. Dr. Adolph had just been informed by the Coast Guard that fines had been assessed and that the Astor might be seized. He had gone this route before, and did not want to give Katz the opportunity of initiating another round of fines. Dr. Adolph allowed Katz to remain on the yacht because he felt sorry for him, and also because he had not yet arranged for the Astor's future care. Any contract that Katz entered into was contrary to the explicit orders of Dr. Adolph.

The plaintiffs rely on defendant's exhibit 19, an "Agreement of Participation of Captain of Schooner Astor" dated November 25, 1974, signed by Katz, and signed and marked accepted by Dr. Adolph. Despite all inclusive requests to produce, Dr. Adolph did not provide this document until after the plaintiffs had rested their case. Plaintiffs claim Dr. Adolph only turned the document over at this point because of the surprise appearance at trial of Katz, who had disappeared in 1976, and had never resurfaced. Even giving plaintiffs the benefit of the doubt regarding this document, there is still no indication of actual authority. The document indicates that Katz would draw no salary as captain "until such time as the Astor receives revenue from charters." Specific permission is given for Katz to live aboard the Astor, and the document also states that "the decision of the owner of the Astor will be final and decisive in all mat-

**12.** The Judiciary Act of 1789, § 9, 1 Stat. 73, provided for exclusive admiralty jurisdiction in the district courts, "saving to suitors . . . a common law remedy where the common law is competent to give it." This clause has been interpreted as conferring concurrent jurisdiction on the state courts to hear most non-maritime lien admiralty cases. *See The Hine v. Trevor*, 71 U.S. (4 Wall.) 555, 18 L.Ed. 451 (1866); *Rounds v. Cloverport Foundry & Machine Co.*, 237 U.S. 303, 35 S.Ct. 596, 59 L.Ed. 966 (1915). The "saving to suitors" clause is, in essence, codified in 28 U.S.C. § 1333 (1976), the admiralty jurisdiction statute.

ters of this agreement . . . ." The clear import of the agreement is that any decisions on charters were to be made by Dr. Adolph. There is no indication that Katz was given specific permission to charter the Astor—the agreement simply noted that until revenue came in Katz would draw no salary. If Katz had been given permission to charter the vessel, it would likely have been spelled out specifically, as was Katz's permission to live on the Astor. Even had the document provided actual authority (which the court finds it did not), that authority was revoked in December 1975. While such a revocation might not have ended Katz's apparent authority (assuming he had any), it certainly revoked any actual authority he might have had.

Plaintiffs also claim that plaintiffs' exhibit 58 is indicative of the actual authority Katz had. This exhibit is a letter from Katz to Dr. Adolph, dated September 10, 1975, that indicates that Katz would run a charter operation, and pay Dr. Adolph a percentage of the revenues. Katz had this document in his possession at all times. There is no indication this letter was ever mailed to or seen by Dr. Adolph. The Court finds that Dr. Adolph had no knowledge of this letter at any time. It cannot serve as any basis for establishing Katz's actual authority.

D. *Apparent Authority*

 Plaintiffs also argue that Katz had apparent authority to bind Dr. Adolph to the charter management contract. This Court finds there was no apparent authority. Restatement (Second) of Agency § 8 (1958) states: "Apparent authority is the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons." Section 27 of the Restatement indi-

cates that apparent authority is created as to a third person "by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." Apparent authority depends on representations from the principal to the third party. In this case there were *no* direct representations from Dr. Adolph to Waikane. Plaintiffs argue nonetheless that the documents Katz showed Waikane at the time the charter management agreement was entered into are sufficient to establish apparent authority.

The main document that plaintiffs rely on is defendant's exhibit 19, discussed above. This "agreement" between Katz and Dr. Adolph was produced after Prosser, Waikane's business manager, had testified. Prosser indicated in a post-trial affidavit that this document was one of the ones he had examined when talking to Katz, prior to the execution of the charter management agreement. Under the circumstances the Court accepts this as true. Unfortunately for the plaintiffs, the document does not help establish Katz's apparent authority.

The possibility of chartering the Astor is mentioned in the "agreement." However, it is also clear from the agreement that "the decision of the owner shall be final in all matters." This obviously does not refer to the everyday decisions of running the ship, but there was absolutely no reason for Waikane to suppose that the owner did not make all decisions regarding chartering. The "agreement" gave every indication that contracting to charter the Astor was outside the scope of Katz's authority. The "agreement" gave every indication that Katz's decisionmaking power was substantially less than that of the normal master.[13]

---

**13.** There are no cases directly in point as to the authority of a master to enter into a charter contract against the orders of the owner. Plaintiffs cite *The Freeman v. Buckingham*, 59 U.S. (18 How.) 182, 15 L.Ed. 341 (1855) for the proposition that "The owner of the vessel is liable for a charter party made by his master

regardless of secret instructions inconsistent with the authority with which the master appears to be clothed." The case does not stand for that proposition. In *The Freeman*, the master and the special owner (the charterer) issued some fraudulent bills of lading. The holders of these bills sued the general owner of the ship,

In the "agreement" there were no details on charter arrangements, and there was no express permission given to Katz to arrange charters. The "agreement" presented the picture of a captain who had the authority to sail the Astor and nothing more.

Plaintiffs also point again to plaintiffs' exhibit 58. Since the Court has already determined that Dr. Adolph was completely unaware of this letter, it does not represent any act or conduct of Dr. Adolph, and hence cannot be used to show apparent authority. The Court does note that Waikane, when shown the *original* of what was purportedly a letter *to* Dr. Adolph, should have suspected that Dr. Adolph might not ever have seen the letter.

Plaintiffs next point to a series of blank bareboat charter forms, as well as one executed bareboat charter agreement concerning the voyage of the Astor from California to Hawaii. This charter contract, while purportedly between Dr. Adolph, as owner, and the "charterers," was never signed by Dr. Adolph or even by an agent of Dr. Adolph. In no way does it (or the blank forms) qualify as acts or conduct of Dr. Adolph.

Prosser indicated in his post-trial affidavit that one of the reasons he believed Katz had the authority to charter the Astor was that he saw Coast Guard seizure papers naming Katz as captain of the Astor. These papers indicated that the Astor had been seized, *inter alia*, for violating 46 U.S.C. § 289, transporting passengers between ports in the United States on a foreign vessel. Prosser also said that he saw the bareboat charter contract for the trip from California, which trip was the subject of the Coast Guard seizure. The reasonable charter broker in this situation would have wondered whether the owner had approved a charter arrangement at least facially similar to the one that had resulted in the

---

and the Court held that neither the general owner nor the ship were liable on the fraudulent bills of lading. The Court stated in *dicta*:

> Even if the master had been appointed by the [general owner], a wilful fraud committed by him on a third person, by signing false bills of lading, would not be within his agency. . . . The taker [of the bill of lading] assumes the risk, not only of the genuineness of the signature, and of the fact that the signer was master of the vessel, but also of the apparent authority of the master to issue the bill of lading. We say the apparent authority, because any secret instructions by the owner, inconsistent with the authority with which the master appears to be clothed, would not affect third persons. But the master of a vessel has no more an apparent unlimited authority to sign bills of lading, than he has to sign bills of sale of the ship. He has an apparent authority, if the ship be a general one, to sign bills of lading for cargo actually shipped . . . . But the authority in each case, arises out of, and depends upon, a particular state of facts. It is not an unlimited authority . . . [and] does not bind the owner, even in favor of an innocent purchaser, if the facts upon which his power depended did not exist; and *it is incumbent upon those who are about to change their condition, upon the faith of his authority, to ascertain the existence of all facts upon which his authority depends.*

59 U.S. (18 How.) at 191, 15 L.Ed. 341 (emphasis added). All the case stands for is the proposition that the master of a ship that deals in the carriage of cargo can bind the ship to a non-fraudulent contract for the carriage of cargo. In the first place, a bareboat charter contract makes the charterer the owner *pro hac vice*, and this affects the rights of the owner much more than a simple contract for the carriage of cargo (affreightment). In the second place, this bareboat charter was entered into by Katz fraudulently, against the express orders of Dr. Adolph. In the third place, the "facts upon which [Katz's] power depended did not exist," and Waikane made no attempt to ascertain the existence of such facts. *The Freeman*, if anything, goes squarely against plaintiffs' contentions.

The plaintiffs also state that *Andrews v. Wall*, 44 U.S. (3 How.) 568, 11 L.Ed. 729 (1845) stands for the proposition that "the master's charter party contract binds the owner even though the master has been removed prior to performance." The Court in that case stated in *dicta* that a charter party entered into by a master bound the owner even after the master's death *if the contract was entered into within the scope of the master's authority.* In no way does the case purport to say anything about the authority of a master to enter into a charter arrangement without the consent of the owner.

It is not necessary to determine generally the authority of a master to bind an owner to a charter contract. This case is so far removed from the case in which the master of a vessel engaged in active commerce agrees to a business charter, that even if there were authority in that case, there would be none in this one.

Coast Guard seizure. Possibly charters starting in Honolulu, and ending in Honolulu, would not be prohibited by the statute, but the Harris charter, which was to end in Lahaina, almost certainly would be.[14] Regardless of the legal niceties, the very fact of a customs seizure should have alerted Waikane that the owner had to be contacted. Perhaps if Katz had some specific written authorization from Dr. Adolph that contact would not have been necessary, but the only documents Katz had were ambiguous at best.

Plaintiffs also rely on the fact that Dr. Adolph had apparently allowed Katz to remain as master of the Astor. It is perhaps conceivable that in 1820 a master of a vessel could have bound an owner in the circumstances of this case.[15] It is not conceivable in the day of the forty-cent phone call to Los Angeles. The Court can see no possible justification for Waikane having failed to contact Dr. Adolph. Apparent authority is not determined subjectively. The actions of the principal "reasonably interpreted" must cause the third person to believe there is consent to the actions of the agent. This Court finds that the actions of Dr. Adolph, reasonably interpreted, should not have given rise to the belief that Katz had permission to charter the Astor. There was no apparent authority.[16]

E. *Estoppel and Ratification*

■ Plaintiffs claim that even if there were no authority, Dr. Adolph is estopped from denying the existence of a valid contract. Restatement (Second) of Agency § 8B (1958) indicates that there can be liability on the basis of estoppel if the principal either intentionally or carelessly causes the belief as to the authority of the agent, or knowing that such belief is held, fails to take reasonable steps to notify the third persons of the facts. The Court finds that Dr. Adolph did nothing to intentionally or carelessly lead Waikane into believing Katz had the authority to charter the Astor. The Court also finds that Dr. Adolph never knew that Waikane believed it had a valid contract with him until after he had evicted Katz from the Astor. The Court further finds that any reliance on the part of Waikane was unreasonable. There was no estoppel.

■ The final claim of the plaintiffs is that Dr. Adolph ratified the contract between Waikane and Katz, because he knew about it (or knowledge should be imputed to him) and did nothing. The Court finds that Dr. Adolph had no actual knowledge of the contract, and none should be imputed to him. There was, therefore, no ratification.

In light of the above, the Court finds that the contract entered into between Katz and Waikane was not binding on Dr. Adolph, and hence he is not liable for any of the damage suffered by the plaintiffs. Since his acts in repossessing the Astor were entirely within his rights, he is not liable to the plaintiffs on a tort theory either. Dr. Adolph may recover his costs from Waikane.

The above constitutes the Findings of Fact and Conclusions of Law required by Rule 52(a) of the Federal Rules of Civil Procedure.

■

---

14. It would depend on whether the Harris charter was viewed as a bareboat charter, or a voyage or time charter. *See* notes 1 & 2 *supra.*

15. *But see* note 13 *infra.*

16. There is no indication that Hawaii law would support a different conclusion. The only case this Court can locate dealing with apparent authority is *Hawaiian Paradise Park Corp. v. Friendly Broadcasting Co.,* 414 F.2d 750, 756 (9th Cir. 1969). That is a case in which the Hawaii law of apparent authority should be applicable. No Hawaii cases are cited, however, and the court relies on general principles of agency law, including the Restatement.